NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0356n.06
Filed: May 25, 2007

Nos. 06-1136, 06-1137

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | ON APPEAL FROM |
| Plaintiff-Appellee, | ) | THE UNITED STATES |
| | ) | DISTRICT COURT FOR |
| Aaron Moses Cobbs, III, and | ) | THE WESTERN DISTRICT OF |
| Nicole Anne King, | ) | MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: MARTIN and SUTTON, Circuit Judges, and GRAHAM,[*] district Judge.

GRAHAM, District Judge. Defendants-appellants, Aaron Moses Cobbs, III, and Nicole Anne King, were indicted in the Western District of Michigan on drug and firearms charges. In a second superseding indictment filed on March 31, 2005, the defendants were charged in Count 1 with conspiring to distribute and to possess with the intent to distribute over five grams of cocaine base (crack cocaine) in violation of 21 U.S.C. §846. Cobbs was also charged with distributing crack cocaine in violation of 21 U.S.C. §841(a)(1) (Counts 2 and 3); possession with intent to distribute over five grams of cocaine base in violation of 21 U.S.C. §841(a)(1) (Count 4); possession of firearms in furtherance of drug trafficking crimes (Count 5); possession of a machine gun in violation of 18 U.S.C. §922(*o*) (Count 6); and possession of a firearm having an obliterated serial number in violation of 18 U.S.C. §922(k) (Count 7).

---

[*] The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

In the instant appeal, Cobbs challenges his convictions, and King contends that the district court erred in calculating her sentencing range under the advisory United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). For the reasons that follow, we AFFIRM the district court.

I. Evidence Presented

The government presented the testimony of officers assigned to the Traverse Narcotics Team ("TNT"), which investigates narcotics activity in northwestern Michigan. Detective Ryan Salisbury, a TNT officer acting in an undercover capacity, had several contacts with Adam Cornell concerning the purchase of crack cocaine. On January 6, 2005, Detective Salisbury contacted Cornell and arranged to purchase a "teener," 1.5 to 1.7 grams of crack cocaine, for $170. Cornell stated that he would have to go somewhere to pick up the crack. Detective Salisbury later met with Cornell at Cornell's residence and completed the transaction.

On January 10, 2005, Salisbury met Cornell at a gas station in Grand Traverse County, and provided him with $130 to purchase crack cocaine. Surveillance officers observed Cornell and another man later identified as Brandon Way drive from the station to a residence located at 7330 Youker Road in rural Grand Traverse County. Cobbs and King resided at the Youker Road residence with King's two minor children. After three to five minutes, Cornell and Way left the Youker Road residence, and drove to a McDonald's restaurant, where they met with Salisbury and completed the delivery of crack cocaine.

Shortly after Cornell's departure, Cobbs, who was accompanied by a male passenger later identified as Mansour Harrell, and King left the Youker Road residence in separate vehicles. Officers executed a search warrant at the Youker Road residence later that day. Officers found a sock containing 36.75 grams of crack cocaine in the drawer of a dresser located in the master

2

bedroom. The rocks of crack cocaine were individually wrapped in "corner baggies" made from the corners of small plastic bags which were twisted shut.

During the search, a gun rack was observed on the wall next to the dresser where the crack cocaine was located. The gun rack contained two rifles, an unloaded semiautomatic 30.06 and an AR-15. Two ammunition magazines and other ammunition for rifles and pistols were found in the gun rack. One of the magazines, identified as an M—16 magazine, contained thirty-six rounds. An unloaded .22 Remington long rifle and a .12 gauge shotgun were also collected from the master bedroom. A locked safe located on a shelf near the dresser was found to contain $2,000 in cash and four handguns, including a loaded .357 Taurus revolver, and a loaded Desert Eagle .40 caliber handgun. The safe also held a vehicle title in Cobbs's name, two vehicle titles in the name of Dorothy J. Cobb, Cobbs's mother, a check in the amount of $200 made out to Cobbs, and receipts in King's name. A handgun with an obliterated serial number was found hanging on a nail in the closet of the master bedroom.

The parties stipulated that all of the weapons were manufactured outside Michigan. The parties also stipulated that the substance recovered from the bedroom was crack cocaine in the amount of 36.75 grams.

Officers also observed adult clothing and $53 in a shoe box in the master bedroom. Men's clothing, including shorts and a pair of blue jeans, was seized from the dresser in which the crack cocaine was found. Two police scanners were found on the top of the dresser. A second bedroom contained children's toys. Boxes of plastic sandwich bags were found in the kitchen area, and a digital scale was also seized from the house.

Officer Kevin Dunklow followed Cobbs's vehicle when it left the Youker Road residence. The vehicle was stopped, and Cobbs was placed under arrest. Cobbs had $1,000 in cash in his pants pocket.

Lieutenant Kipling Belcher, supervisor of the TNT office, testified as an expert and fact witness. Lieutenant Belcher had been assigned to the TNT office for six years. He had been involved in at least 1,200 narcotics investigations as a police officer, 200 of those being crack cocaine investigations, and had overseen at least 900 investigations as a supervisor with the TNT.

Lieutenant Belcher testified that based on his investigations and conversations with drug dealers, he was familiar with the tools of the trade used in illegal narcotics trafficking. Lieutenant Belcher testified that crack cocaine dealers used small plastic bags for distributing crack cocaine by cutting the two bottom corners off each bag, placing the piece of crack into a corner, and sealing the corner with a lighter or by tying it shut. He stated that the baggies of crack cocaine found in the sock were consistent with this corner method of packaging. Lieutenant Belcher also testified concerning how crack cocaine is used by smoking it in a pipe. He stated that the pre-wrapped quantities seized from the Youker Road residence, which averaged about 1.6 grams per package, were each sufficient for seven or eight doses.

Lieutenant Belcher further testified that precise digital scales such as the scale found during the execution of the warrant are tools of the drug trafficking trade because crack dealers have to be exact with their measurements due to the high cost of a small amount of substance. He stated that drug dealers use cash in selling drugs and in buying more drugs from their suppliers. He also testified that it was common for drug distributors to use police scanners to monitor police activity

in their areas. He further stated that drug dealers typically used guns for intimidation and to protect the drugs and money from theft.

Lieutenant Belcher also testified concerning his conversation with Cobbs following his arrest. Cobbs first denied living at the Youker Road residence, but later admitted that he lived there. Cobbs admitted that he owned the AR-15 weapon, but they did not discuss whether the gun was fully automatic. When asked about his employment, Cobbs stated that he occasionally babysat for relatives downstate. Lieutenant Belcher also interviewed King, who stated that she lived at the Youker Road address. When questioned about her employment, she stated that she had childcare responsibilities that provided some income. King stated that the handguns at the residence were registered in her name, but she denied any knowledge of the handgun with the obliterated serial number.

Anthony Romanowski, employed by the Grand Traverse County Sheriff's Department as a firearms instructor, testified concerning the firearms seized at the Youker Road residence. Romanowski, a SIG and Colt armorer, attended factory schools to learn to do repairs and modifications to handguns and the M—16 rifle. He testified that the AR-15 is a semi-automatic assault rifle available on the civilian market, whereas the M—16 is a fully automatic military machine gun which cannot be purchased by the general public. Parts had been changed and added to the AR-15 seized from the Youker Road residence which permitted the rifle to operate as a fully automatic machine gun. When test-fired, the weapon functioned as a fully automatic machine gun, that is, it was possible to fire more than one shot without pulling the trigger for each shot.

Adam Cornell testified that in December of 2004 and January of 2005, he accompanied Brandon Way on ten or twelve occasions to purchase crack cocaine at the Youker Road residence.

He usually purchased one-sixteenth to one-eighth of an ounce. Way identified the sellers as Nicole King and her boyfriend "Birdman." On one occasion after Cornell gave Way money for crack cocaine, Way made a phone call. King then stopped by Way's house, and when she left, Way had the crack cocaine. Way would enter the house on Youker Road alone to obtain the crack cocaine. The crack cocaine Cornell sold to Detective Salisbury came from that address.

Brandon Way testified that he purchased crack cocaine from Cobbs and King on January 6 and 10, 2005, at the house on Youker Road, and that he had purchased crack cocaine from them on approximately fifteen occasions spanning over three to four months prior to January 10th. Way usually bought a "teener," approximately 1.7 grams, for $125, and occasionally an "eight ball," approximately three-and-a-half grams, for $250. A "teener" constituted fifty doses of crack cocaine. Way purchased crack cocaine for Cornell, who would then sell it. Way would notify Cobbs by telephone that he was coming, then he would go to Youker Road and Cobbs would hand him the crack cocaine. On one occasion when Cobbs was not there, King gave him the crack cocaine. On another occasion, King and Cobbs were leaving the residence and left a "teener" in a boot for him to pick up. Way testified that he had observed the gun rack in the bedroom shared by Cobbs and King. He fired the AR-15 on one occasion approximately two months prior to January 10th, and it operated as a semiautomatic at that time.

Rebecca Reid testified that during the period from November of 2004 to January of 2005, she purchased crack cocaine from King on one occasion. Jeremy Shafer, Reid's boyfriend, testified that from November, 2004, to January, 2005, he purchased crack cocaine from Cobbs on four or five occasions. In November and December of 2004, he also purchased crack cocaine from King. On those occasions, Shafer phoned Cobbs and ordered the crack cocaine, and when he went to the house

6

on Youker Road, King handed him the crack cocaine. Shafer usually purchased a rock of crack cocaine for fifty or sixty dollars.

Darrell Silber, the owner of a sporting goods business in White Lake, Michigan, identified the purchase records for the AR-15 seized at the Youker Road address. The records indicated that the rifle and a thirty-round magazine were sold to an Aaron Cobbs at a gun show in Cadillac, Michigan, on March 13, 2004. Silber could not identify Cobbs at trial, but the purchase form indicated that Cobbs showed a Michigan ID card with his picture on it to complete the purchase. Silber testified that the gun was a new gun and was sold as a semiautomatic, but that parts could be purchased to convert it to a machine gun. He identified the magazines seized from the Youker Road residence as being a forty-round AR-15 magazine, which would fit the AR-15 gun, and an AK-47 magazine, which would not.

Shirley Shananaquet, the administrator of the player tracking system used by the Turtle Creek Casino and Leelanau Sands Casino in Traverse City, Michigan, testified that the casinos used a Players' Club card to electronically track the play and chip purchases of club members. The records reflected that Cobbs's Players' Club card was used to purchase $57,340 in chips during the year 2004. These records did not show whether Cobbs personally used the card, or if he made chip purchases without showing his card. The account showed a net loss of $29,222.25 for the year, calculated from ratings put in manually by casino employees at the game tables or mechanically at the slot machines.

The government also presented Michigan state income tax returns for Cobbs and King. Cobbs claimed total income in the amount of $2,666 on his 2003 state tax return, and total income in the amount of $11,359 on his 2004 state tax return. King claimed adjusted gross income in the

7

amount of $10,065 on her 2003 state income tax return for 2003. The parties stipulated that these Michigan tax returns were authentic and admissible.

Recordings of statements made by Cobbs during phone conversations in which he participated while he was incarcerated were also introduced into evidence. In one conversation, Cobbs told his mother that he had lost four or five thousand dollars in the last two days, and that he had two thousand dollars at home. Cobbs also referred to his blue jeans and the fifty-three dollars which were seized during the search of his residence. In another conversation, Cobbs told King, "It's bad for me ... I had the shit." In another tape, Cobbs and King discussed Brandon Way's possible role in the investigation, and Cobbs stated, "[T]hat boot had a mark on it too, probably, so, I mean ... I might be fucked." Mansour Harrell, Cobbs's cousin, testified on behalf of Cobbs. He stated that beginning in the summer of 2004, he stayed with Cobbs occasionally for two to three weeks at a time. He testified that the crack cocaine found in the sock in the master bedroom belonged to him and was his personal supply, and that he had placed it there prior to leaving the house so that the children would not disturb it.

Melody King, King's mother, testified that their family was associated with a gun club in Kingsley.

The jury returned a verdict of guilty on all counts. Cobbs was sentenced to a term of incarceration of ninety-seven months on Counts 1 through 4 and 6 and a term of sixty months on Count 7, to be served concurrently, and a consecutive term of incarceration of three hundred and sixty months on Count 5.

King objected to the probation officer's calculations of her sentencing range under the advisory Guidelines. The district court denied her objections to the amount of crack cocaine being

considered as relevant conduct and the firearm enhancement, but awarded her a four-level reduction for role in the offense as a minimal participant, and departed downward from a Criminal History Category II to a Criminal History Category I. This resulted in a total offense level of 28, with a guideline sentencing range of 78 to 97 months. After considering the statutory sentencing factors, the district court imposed a sentence of 78 months incarceration.

## II. Cobbs

### A. Sufficiency of Count 5

Count 2 of the original and first superseding indictments charged that Cobbs "did knowingly possess the following firearms in furtherance of a drug trafficking crime" in violation of 18 U.S.C. §942(c)(1)(A). In the second superseding indictment, this count was renumbered as Count 5, which alleged that "defendant herein, during and in relation to a drug trafficking crime ... did knowingly possess one or more of the following firearms in furtherance of any of the above said drug trafficking crimes[.]" Cobbs argues that Count 5 does not state an offense under §924(c), and that the district court improperly amended the indictment by instructing the jury solely on the offense of knowingly possessing firearms in furtherance of a drug trafficking crime.

The sufficiency of the indictment is reviewed de novo. *United States v. Lloyd*, 462 F.3d 510, 513 (6th Cir. 2006). Cobbs did not object to the sufficiency of the indictment prior to this appeal. Pursuant to Fed.R.Crim.P. 12(b)(3), defects in an indictment, unless they pertain to jurisdiction, must be raised prior to trial. *See United States v. Adesida*, 129 F.3d 846, 849 (6th Cir. 1997). Since Cobbs did not object to the sufficiency of the indictment below, the indictment must be liberally construed in favor of its sufficiency, and his conviction on Count 5 may not be reversed unless the indictment cannot be reasonably construed to charge a crime. *Lloyd*, 462 F.3d at 513. Cobbs also did not object

9

to the jury instructions given by the district court. Thus, the conviction on Count 5 may be overturned only if there was plain error which affected Cobbs's substantial rights. *Id*. at 514.

It is well established that 18 U.S.C. §924(c)(1)(A) creates two distinct criminal offenses. *Id*. at 513; *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004). These offenses are: (1) using or carrying a firearm during and in relation to any crime of violence or drug trafficking crime; and (2) possessing a firearm in furtherance of any crime of violence or drug trafficking crime. *Lloyd*, 462 F.3d at 513.

In this case, Count 5 charged that Cobbs "knowingly possess[ed] one or more of the following firearms in furtherance of any of the above said drug trafficking crimes[.]" Count 5 also alleged that Cobbs acted "during and in relation to a drug trafficking crime[.]" There is no allegation in that count that Cobbs used or carried a firearm. The language of Count 5 is sufficient to charge all of the necessary elements for the offense of possession of a firearm in furtherance of a drug trafficking crime. However, it does not charge all of the elements necessary for the offense of using or carrying a firearm during and in relation to a drug trafficking crime. The language in Count 5 which reads "during and in relation to a drug trafficking crime" is surplusage. Its presence in the indictment does not alter the fact that Count 5 contains all of the allegations necessary to charge the offense of possession of a firearm in furtherance of a drug trafficking crime.

*United States v. Combs* is distinguishable. The indictment in *Combs* charged the defendant with "possess[ing] a firearm during and in relation to" a drug trafficking crime, utilizing only one element from each of the distinct §924(c) offenses. Thus, the indictment failed to charge any offense. *Combs*, 369 F.3d at 934. Here, Count 5 contains all of the elements required to charge the offense of possession of a firearm in furtherance of a drug trafficking crime.

10

The remaining question is whether the inclusion of the surplus language in the indictment affected any of Cobbs's substantial rights. Count 5 is not duplicitous. Unlike the indictments in *Lloyd*, *United States v. Savoires*, 430 F.3d 376 (6th Cir. 2005) and *United States v. Davis*, 306 F.3d 398 (6th Cir. 2002), Count 5 did not charge two offenses under §924(c) in a single count. Further, even where an indictment is duplicitous, "proper jury instructions can mitigate the risk of jury confusion[.]" *Lloyd*, 462 F.3d at 514. The trial court below instructed the jury only on the offense of possessing firearms in furtherance of the cocaine trafficking crimes alleged in the indictment; the "during and in relation to" language was not included in the charge. There was no risk of jury confusion or a verdict which was not unanimous.

Defendant does not claim that the court's instructions were incorrect, but argues that the instructions improperly amended Count 5. However, the Supreme Court has rejected the argument that judicial narrowing of an indictment constitutes an amendment rendering the indictment void. *See United States v. Miller*, 471 U.S. 130, 136-44, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). "A court does not err in ignoring irrelevancies in or striking surplusage from an indictment." *United States v. Grenoble*, 413 F.3d 569, 577 (6th Cir. 2005)(citing *United States v. McGuire*, 744 F.2d 1197, 1206 (6th Cir. 1984)). The district court's instructions narrowed the scope of the indictment by instructing the jury only on the possession offense under §924(c) which was adequately charged in Count 5 of the indictment. The district court did not impermissibly broaden the charge to include an offense which was not alleged in the indictment. *See Grenoble*, 413 F.3d at 577, n. 6.

Count 5 charged a cognizable possession offense under §924(c), and this claim of error is not well taken.

B. Sufficiency of the Evidence

11

Cobbs argues that the evidence presented at trial was insufficient to sustain his convictions for conspiracy, possession with intent to distribute cocaine base, possession of firearms in furtherance of a drug trafficking crime, possession of a machine gun, and possession of a firearm with an obliterated serial number. Cobbs made no motion for judgment of acquittal at trial. In order to appeal a jury's verdict on the basis of insufficient evidence, the defendant must have moved for acquittal in the district court pursuant to Rule 29. *United States v. McBride*, 362 F.3d 360, 368 (6th Cir. 2004). Because no Rule 29 motion was made below, the evidence against Cobbs is reviewed under a "manifest miscarriage of justice" standard, and "we only reverse a conviction if the record is devoid of evidence pointing to guilt." *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002).

1. 21 U.S.C. §846 - Conspiracy

Cobbs first argues that the evidence is insufficient to support his conviction for conspiracy under 21 U.S.C. §846. The elements of a drug conspiracy are: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy. *United States v. Caver*, 470 F.3d 220, 232-33 (6th Cir. 2007)(citing *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999). The agreement to violate drug laws need not be express or formal; a tacit or mutual understanding among the parties is sufficient. *United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994). The evidence must show that the defendant had knowledge of the conspiracy's object and consciously committed himself to the furtherance of that object. *Caver*, 470 F.3d at 233. "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

Cobbs argues that the evidence is insufficient to establish that he and King conspired to sell drugs, as opposed to selling drugs independently. The evidence showed that Cobbs and King resided together at the Youker Road residence, and that they both sold crack cocaine at the residence. Only one stash of crack cocaine was found in the residence in a bedroom shared by Cobbs and King. Brandon Way testified that King asked him if he was interested in purchasing crack cocaine, and he began purchasing it as a middleman for Adam Cornell. Way contacted Cobbs when he wanted to purchase cocaine, and he would go to the Youker Road residence to pick it up. On one occasion when Cobbs was not there, King gave him the crack cocaine. Jeremy Shafer testified that he would telephone Cobbs and arrange to purchase crack cocaine. He stated that once or twice, he got the crack cocaine from King and gave her the money. On those occasions, he first talked to Cobbs on the telephone, and Cobbs told him to come to the residence. There is sufficient evidence to support the existence of a conspiracy in which Cobbs and King knowingly, intentionally and voluntarily participated.

2. 21 U.S.C. §841(a)(1) - Possession

Cobbs also challenges the sufficiency of the evidence to support his conviction for possession with the intent to distribute the crack cocaine found in the sock. The elements of a charge of possession with intent to distribute illegal drugs under 21 U.S.C. §841(a)(1) are: "(1) the defendant knowingly, (2) possessed a controlled substance, (3) with intent to distribute." *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006). Proof of constructive possession through direct or circumstantial evidence is sufficient. *United States v. Welch*, 97 F.3d 142, 150 (6th Cir. 1996). To establish constructive possession, the evidence must show that Cobbs knowingly had the power and the intention at a given time to exercise dominion and control over the crack cocaine either directly

or through others. *Id*. While mere proximity to the drugs is not sufficient, proximity combined with other evidence of the defendant's involvement in a conspiracy to distribute crack cocaine will suffice to establish possession. *Id*. at 150-51. A jury may also infer constructive possession over items found in a defendant's home. *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998).

Testimony was presented at trial that Cobbs was involved in the distribution of crack cocaine from his residence on Youker Road. The sock containing the crack cocaine was found in a dresser located in the bedroom shared by Cobbs and King. A pair of blue jeans belonging to Cobbs was found in the same dresser. The crack cocaine was packaged in individual corner baggies typically used for distribution.

Cobbs relies on the testimony of his cousin, Mansour Harrell, who testified that the crack cocaine in the sock belonged to him. Cobbs argues that this testimony provides equal support for his theory of innocence, which therefore must be accepted. However, circumstantial evidence, standing alone, can sustain a guilty verdict, and the circumstantial evidence need not remove every reasonable hypothesis except that of guilt. *United States v. Jones*, 124 F.3d 781, 784 (6th Cir. 1997). In addition, while there was ample evidence that Cobbs sold crack cocaine at his residence, Harrell testified that he used crack cocaine but did not sell it. The evidence showed that the crack cocaine in the sock weighed 36.75 grams, and that each individual package contained about 1.6 grams, sufficient for seven to eight doses. This indicates that the crack cocaine was being held for purposes of distribution, not personal use. The jury apparently found Harrell's testimony to be unworthy of belief, and such issues of credibility are for the jury to determine. *Id*. There is sufficient evidence to support Cobbs's conviction for possession.

3. 18 U.S.C. §924(c) - Possession of Firearms in Furtherance of Drug Offenses

Cobbs also disputes the sufficiency of the evidence to sustain his conviction for possession of firearms in furtherance of drug trafficking crimes. Under 18 U.S.C. §924(c), defendant must possess a firearm "in furtherance of" a drug trafficking crime. Possession of the weapon may be actual or constructive, and it may be either exclusive or joint. *United States v. Paige*, 470 F.3d 603, 610 (6th Cir. 2006). "Proof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession." *Coffee*, 434 F.3d at 896.

A firearm is possessed "in furtherance of" a drug trafficking offense if it advances, promotes or facilitates the crime. *Paige*, 470 F.3d at 609; *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001). There must be a "specific nexus between the gun and the crime charged." *Mackey*, 265 F.3d at 462. Possession of a firearm on the same premises where drugs are located, without more, is not sufficient; rather, the gun must be "strategically located so that it is quickly and easily available for use." *Id*. Other relevant factors may include whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found. *Id*. In *Mackey*, this court found sufficient evidence to support possession "in furtherance of" a drug offense where an illegally possessed, loaded, short-barreled shotgun was found in the living room of the crack house, was easily accessible to the defendant, and was located near the scales and razor blades, and the defendant, who was detained near the gun, possessed cocaine and a large amount of cash.

The evidence at trial showed that guns, cash and crack cocaine were found in the master bedroom shared by Cobbs and King. Three rifles and a shotgun were found in the master bedroom. An AR-15 assault rifle was located in a gun rack on the wall next to the dresser where the crack cocaine was stored. The AR-15 had been illegally converted into an automatic weapon. A loaded

15

magazine containing thirty-six rounds for the AR-15 was also in the gun rack ready at hand. A locked safe on a shelf near the dresser was found to contain $2,000 in cash and four handguns, two of them loaded. Although King claimed ownership of these handguns, the safe also contained papers belonging to Cobbs, thus indicating that Cobbs also had access to the safe. Fifty-three dollars in cash was found in a shoe box in the bedroom. The evidence revealed that customers came to the residence to purchase drugs. Thus, there is sufficient evidence of a nexus between the drug offenses and the possession of the firearms, and it was reasonable for the jury to find that the guns were kept ready at hand to protect the drugs and drug proceeds. The evidence is sufficient to sustain Cobbs's conviction for this offense.

### 4. 18 U.S.C. §922(k) and (*o*) - Possession of Firearm with Obliterated Serial Number and Machine Gun

Cobbs also contests the sufficiency of the evidence to support his convictions for possession of a firearm with an obliterated serial number under 18 U.S.C. §922(k) and a machine gun under 18 U.S.C. §922(*o*). To prove an offense under §922(k), the government must prove that Cobbs: (1) knowingly possessed a firearm; (2) which had its serial number altered, removed or obliterated; and (3) had been shipped, received or transported in interstate commerce. *United States v. Mixon*, 166 F.3d 1216 (table), 1998 WL 739897 at *2 (6th Cir. Oct. 8, 1998). This offense requires knowledge on the part of the defendant that the firearm he possessed had an obliterated serial number. *United States v. Percival*, 50 Fed.Appx. 280, 281, 2002 WL 31477848 (6th Cir. Nov. 5, 2002). Cobbs argues that the evidence is insufficient to show that he had knowledge that the serial number was obliterated.

Evidence was presented that the firearm was found hanging on a nail in the closet of the master bedroom shared by Cobbs and King. However, in a statement to police, King denied any

16

knowledge of the firearm with the obliterated serial number. From this evidence, the jury could reasonably find that the firearm was placed there and constructively possessed by Cobbs, the other person who had dominion and control over the room. The evidence also established that the scraped-down serial number was located on the back of the handle of the firearm, in the plain view of anyone who handled it.

In *United States v. Thornton*, 463 F.3d 693 (7th Cir. 2006), the Seventh Circuit held that circumstantial evidence of defendant's control over a firearm with an obliterated serial number could support the jury's finding that the defendant knew the serial number had been obliterated, "given that one need only look at the gun to attain that knowledge." *Id*. at 699. *See also*, *United States v. Nesmith*, 29 Fed.Appx. 681, 685, 2002 WL 243182 (2d Cir. Feb. 15, 2002)(possession by defendant and testimony that a person could not handle gun without noticing the obliteration constituted sufficient basis for finding of knowledge); *United States v. Moore*, 54 F.3d 92, 101 (2d Cir. 1995)("A rational juror could also conclude that when Moore distributed guns to members of the organization he had inspected them and was aware that they lacked serial numbers."). The firearm was introduced into evidence as an exhibit. The jury could reasonably have determined that Cobbs would have observed the obliteration of the serial number on the handle of the gun.

To establish an offense under §922(*o*), the government must prove that the defendant knowingly possessed a machine gun, defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 18 U.S.C. §921(a)(23); 26 U.S.C. §5845(b). The government must show that Cobbs was aware that the weapon was a machine gun. *United States v. Morgan*, 216 F.3d 557, 567 (6th Cir. 2000)(citing *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d

17

608 (1994)). "Because an apparently innocent rifle can be converted into an illegal machine gun with no outward sign, scienter as to this crime may not be inferred merely from possession[.]" *United States v. Nass*, 100 Fed.Appx. 415, 417, 2004 WL 1238921 (6th Cir. June 3, 2004).

Cobbs acknowledged ownership of the AR-15 rifle. The evidence shows that when he purchased it as a new weapon, it was a semi-automatic rifle. Evidence was presented that the selector switch on the rifle had been altered with replacement parts to permit the rifle to fire in automatic mode. Darrell Silber, the dealer who sold the gun, testified that it would not have come from the factory in that condition. He testified that he would not have broken the rifle down and inspected it before selling it. However, Brandon Way testified that when he fired the rifle approximately two months prior to the execution of the search warrant, the rifle fired as a semi-automatic, thus eliminating the possibility that the factory mistakenly delivered or Silber mistakenly sold a fully automatic weapon. To fire automatically, the weapon had to have been affirmatively altered with replacement parts during that two-month period. There is no evidence that the weapon was not in Cobbs's custody at any time during this period. The AR-15 was found in Cobbs's bedroom, along with a magazine holding thirty-six rounds which was identified by Officer Greg Hornkohl as an M—16 magazine, the M—16 being the fully automatic version of the AR-15. Based on these circumstances, we cannot say that the record is "devoid of evidence pointing to guilt." *Carnes*, 309 F.3d at 956. Cobbs's convictions for possession of a firearm with an obliterated serial number and a machine gun are supported by the evidence.

Based on the foregoing, we cannot find that a miscarriage of justice occurred in this case, and Cobbs' attack on the sufficiency of the evidence is without merit.

C.  Introduction of Casino Records and Tax Returns

Cobbs argues that the district court erred in admitting evidence of his alleged casino gambling records and his 2003 and 2004 tax returns.  Cobbs argues that the relevancy of the evidence is substantially outweighed by the danger of unfair prejudice and that it should have been excluded under Fed.R.Evid. 403.  He contends that the jury could have believed that he was guilty of the uncharged crimes of illegal gambling and tax evasion, and that this risk was heightened due to the district court's failure to give a limiting instruction under Fed.R.Evid. 404(b).

Cobbs did not object at trial to the admission of this evidence or to the district court's failure to give a limiting instruction.  Cobbs not only failed to object to the tax returns; he also stipulated that they were "authentic and admissible." *See* Stipulation, Record Doc. No. 85.  We have held that a party is bound by what he stipulates. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1107 (6th Cir. 1998), *vacated on other grounds*, 435 U.S. 911 (1978). Therefore, Cobbs is arguably barred from disputing the admissibility of the tax returns in this appeal.  At the very least, in light of his lack of objection to the admission of the tax returns and gambling records, the applicable standard of review is plain error, meaning that "substantial rights" were affected by a plainly erroneous ruling, "resulting in a miscarriage of justice." *United States v. Baker*, 458 F.3d 513, 517 (6th Cir. 2006)(quoting *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989)).  In addition, since Cobbs failed to object to the failure to give a cautionary instruction under Rule 404(b), the plain error standard applies to that claim of error as well. *United States v. Trujillo*, 376 F.3d 593, 606 n. 7 (6th Cir. 2004).

For plain error to exist, there must be (1) error; (2) that is plain; (3) and that affects substantial rights. *Baker*, 458 F.3d at 517; *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).  If all three conditions are met, we may, in our discretion, "notice a

19

forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Baker*, 458 F.3d at 517 (quoting *Johnson*, 520U.S. at 467 (alteration in original))(internal quotation marks omitted).

The government introduced evidence of Cobbs's 2003 and 2004 tax returns. The 2003 return showed that Cobbs had a total income of $2,666 that year, and the 2004 return showed that defendant had a total income of $11,359. The government also presented testimony showing that Cobbs's Players' Club card at a casino was used to purchase $57,340 in chips during 2004. This evidence was produced to show that Cobbs's expenditures far exceeded his legitimate income, inviting the inference that the money used in gambling came from illegal narcotics activity.

We have upheld the admissibility of this type of evidence in previous cases. In *United States v. Carter*, 969 F.2d 197, 201 (6th Cir. 1992), we noted that the government in a narcotics prosecution can introduce evidence concerning the failure to file a tax return along with evidence of extravagant spending or massive unreported wealth. The relevance of such evidence is to create "the inference that the defendant does not possess a legitimate source of income to support his affluent lifestyle and, therefore, the income must originate from narcotics operations." *Id*. at 201. *See also United States v. Beverly*, 369 F.3d 516, 540-41 (6th Cir. 2004)(upholding admission in bank robbery prosecution of evidence of defendant's failure to file tax returns, which indicated that defendant's legal income was insufficient to require the filing of a return, combined with evidence of defendant's purchase of car using cash); *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999)(upholding the admission of defendant's federal income tax information in a narcotics prosecution to show that defendant had great unreported wealth).

20

In *United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002), this court held that the district court did not err in admitting evidence concerning the defendant's income tax returns and gambling activities to show that the money which supported the defendant's lifestyle was not derived from legitimate sources. *Id*. at 376-80. To be relevant and admissible, the lifestyle evidence must relate to wealth acquired during the period in which narcotics trafficking occurred. *Id*. at 378. In regard to the analysis of such evidence under Rule 403, which requires balancing the probative value of the evidence against the risk of unfair prejudice, this court noted that

> the unfair prejudice does not outweigh the probative value if three factors are met: (1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity. Then the evidence would have been properly admitted to demonstrate, not just motive, but also a likelihood that the extra wealth came from illegitimate sources and to support an inference that the defendant committed the alleged crime.

*Id*.

In this case, there was other credible evidence of Cobbs's trafficking in crack cocaine. The tax returns indicated that the money Cobbs spent on gambling was not available from legitimate sources. The conspiracy alleged in the indictment spanned from November of 2004 through January of 2005. Thus, the tax and gambling records from 2004 were recent enough to relate to the period during which the conspiracy was in existence. Although Cobbs argues that this is not true of the 2003 tax return, we rejected a similar argument in *Beverly*, noting that evidence of the defendant's failure to file a tax return for the year preceding his purchase of an automobile with cash could be relevant to demonstrate that the defendant did not have a large income the preceding year which would explain purchases made the following year. *Beverly*, 369 F.3d at 541. Here, evidence that

21

Cobbs reported very little income in 2003 was relevant to show that he did not have a large amount of legitimate income that year to devote to gambling in 2004.

Cobbs also argues that the records from the casino did not establish that he was the person using his Players' Club card on every occasion in 2004. However, there was also no evidence that he loaned his card to someone else. The government also produced a tape of a telephone conversation Cobbs had with his mother in which Cobbs stated he lost $4,000 or $5,000 the last two days, presumably referring to losses at the casino. A sufficient foundation was laid for the admission of this evidence, and the weight to be given the evidence was for the jury.

The gambling and tax return evidence in this case satisfies the *Jackson-Randolph* factors. It likewise did not constitute improper "other act" evidence prohibited under Rule 404(b), which provides that evidence "of other crimes, wrongs, or acts" is inadmissible "to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). The evidence was introduced not as bearing on Cobbs's character, but rather for the legitimate purpose of showing that his spending habits outweighed his legitimate income.

The evidence introduced in the instant case is distinguishable from that in *Carter*, which involved evidence of the failure to file tax returns in a case combined with insufficient evidence to show that the defendant maintained an inexplicably affluent lifestyle. *Carter*, 969 F.2d at 201. Rather, this case is analogous to the situation in *Jackson-Randolph*, which involved evidence of tax returns and gambling activity. This court held that this evidence did "not present a situation of proof of other illegal activity that may improperly persuade a jury to convict based on uncharged crimes–for example, failure to file an income tax return, illegal gambling, or illegal purchases of controlled substances." *Jackson-Randolph*, 282 F.3d at 379. The evidence below showed that

22

Cobbs gambled at a legitimate casino, and that he filed tax returns. The government made no argument before the jury that Cobbs's casino gambling activities or tax returns in any way constituted illegal or immoral activity.

While the failure to give a limiting instruction may have been error, it was not plain error. In fact, Cobbs's failure to request a limiting instruction may have been a tactical decision to avoid calling the jury's attention to this evidence. The admission of the evidence and the lack of a limiting instruction in this case "did not result in substantial prejudice, and there is no indication that a 'miscarriage of justice' resulted." *United States v. Persinger*, 83 Fed.Appx. 55, 60, 2003 WL 22905307 (6th Cir. 2003)(declining to find plain error due to the failure to give a limiting instruction regarding Rule 404(b) evidence).

The relevancy of the evidence was not outweighed by the risk of unfair prejudice, and the failure to give a limiting instruction did not seriously affect the fairness, integrity, or public reputation of the proceedings in this case. No error, plain or otherwise, occurred below in the admission of the gambling evidence and tax returns, and no plain error occurred by reason of the trial court's failure to give a limiting instruction.

D.  Failure to Give Expert Witness Instruction

At trial, the government presented the testimony of Lieutenant Kipling Belcher. Belcher testified as an expert based on his years of experience participating in drug investigations. Cobbs does not argue on appeal that Belcher's testimony was inadmissible.[1] *See United States v. Tocco*, 200 F.3d 401, 418-19 (6th Cir. 2000)(case agent could testify both as a fact witness and as an expert

---

[1] Cobbs filed a motion in limine prior to trial to exclude Belcher's expert testimony. The district court denied the motion without prejudice, noting that the court could not definitively decide whether Belcher could offer an expert opinion until the government produced evidence of the drug trafficking materials found in the instant case. Cobbs did not renew his motion in limine and did not object to Belcher's testimony at trial.

witness concerning organized crime enterprise); *United States v. Thomas*, 74 F.3d 676, 680-83 (6th Cir. 1996)(affirming decision to permit officer to testify as a fact witness and as an expert on drug trafficking, an area not within the experience of the average juror), *abrog. on other grounds recognized, Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998). Rather, Cobbs contends that the trial court erred in failing to give an instruction on the distinction between Belcher's testimony as an expert witness and a fact witness. Since Cobbs did not object to the failure to give such an instruction, the plain error analysis applies. *United States v. Rogers*, 118 F.3d 466, 471 (6th Cir. 1997).

This court noted in *Thomas* that "when a police officer testifies in two different capacities in the same case, there is a significant risk that the jury will be confused by the officer's dual role." *Thomas*, 74 F.3d at 682. We cautioned the district court and the prosecutor to "take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness, so that the jury can give proper weight to each type of testimony." *Id*. at 683. We held that the district court did not abuse its discretion in permitting the officer to testify as an expert where the prosecutor delineated the transition between the examination of the officer as an expert witness and questions relating to his role as a fact witness, and where the district court gave a cautionary instruction at the conclusion of the case. *Id*. Under *Thomas*, the district court was required to instruct the jury on the dual role of Belcher as a fact and expert witness. The issue presented here is whether it was plain error for the district court to fail to give an explanatory instruction to the jury in this case.

Cobbs relies on *United States v. Lopez-Medina*, 461 F.3d 724 (6th Cir. 2006), in which this court found that the failure to instruct the jury constituted plain error. In that case, no drugs were

24

recovered from the defendant's residence. One agent was questioned as an expert about items he himself had seized from defendant's residence, such as vacuum sealers, currency which smelled of ether, packaging materials, and the meaning of cryptic notations on scraps of paper. *Id*. at 744-45. Another agent offered an opinion that documents recovered from the house were drug ledgers. *Id*. at 745. We noted that the agents' testimony at trial lacked any clear demarcation between expert and fact witness roles. *Id*. at 744.

In applying a plain error analysis to the failure to instruct, the *Lopez-Medina* court also considered other evidentiary errors which occurred at trial, primarily the improper admission of the criminal records and mug shots of defendant's alleged co-conspirators. *Id*. at 745 (noting that the jury instruction error, "in conjunction with the other evidentiary errors we find occurred in Medina's trial, may have affected the outcome of his trial and therefore warrants a reversal of his conviction.") The panel concluded that "the introduction of Corona's and Jackson's mug shots and criminal history to the jury here compels that we vacate Medina's conviction" and that the "additional error" in the jury instructions "further buttresses our conclusion of prejudice." *Id*. at 749.

The circumstances in the instant case are distinguishable. Belcher first testified concerning the packaging of crack cocaine for distribution using the corners of plastic bags, noting that this method was consistent with the crack cocaine found in this case. He then testified concerning the manner of using crack cocaine, the typical dosage, and the use of digital scales, police scanners and guns by drug dealers. There was no testimony that he participated in the execution of the search warrant or in the recovery of any of the evidence on which he was asked to comment. At the conclusion of that portion of Belcher's testimony, the prosecutor stated, "Now, let's talk about the specifics of this case. Did you have a role in the investigation of 7330 Youker Road?" Tr. p. 146.

25

Belcher responded, "Yes," and proceeded to describe his interview of Cobbs following his arrest. Thus, the prosecutor made an effort to delineate the transition between his examination of Belcher as an expert witness and questions relating to his role as a fact witness.

In addition, Belcher was not specifically offered as an expert witness to the jury. The word "expert" does not appear during his testimony. Indeed, Cobbs may have decided not to request a cautionary instruction as a matter of strategy to avoid elevating Belcher's testimony to expert status before the jury. *See Persinger*, 83 Fed.Appx. at 60 (finding no plain error where neither the district court nor the parties treated the agent "with the deference normally accorded experts.") Therefore, there is no clear danger that the jury placed undue emphasis on or gave undue credence to Belcher's testimony in the absence of an instruction.

The instant case is also distinguishable because the district court below made no errors in the admission of evidence which prejudiced Cobbs. Further, unlike the largely circumstantial case in *Lopez-Medina*, which depended more on the expert testimony of the agents to connect the defendant to the conspiracy, here there is ample direct evidence of Cobbs's participation in the sale of crack cocaine, including the testimony of eye witnesses. A large quantity of crack cocaine was found in his residence along with several firearms and an illegal machine gun. Cobbs also made incriminating statements. Thus, we cannot say that if the jury had heard an instruction concerning Belcher's dual role, the jury's verdict would have been different. Cobbs has not shown that he suffered substantial prejudice, or that a miscarriage of justice resulted. This claim of error is not well taken.

III. King
A. Enhancement for Possession of Dangerous Weapon

King contests the district court's findings in regard to the application of a two-level enhancement for possession of a weapon during the conspiracy. When reviewing a sentence under

the Guidelines, we apply a clearly erroneous standard to the district court's factual findings and a de novo standard to the court's legal conclusions. *United States v. Stanley*, 23 F.3d 1084, 1085 (6th Cir. 1994).

The probation officer found that a two-level enhancement for possession of dangerous weapons, specifically firearms, was warranted. Although the presentence report and the parties refer to U.S.S.G. §2K2.1(b)(1) as being the source for this enhancement, the correct enhancement provision is U.S.S.G. §2D1.1(b)(1), which applies to the drug offense for which King was convicted.[2] In ruling on this objection, the district court noted that guns and crack cocaine were found in the same bedroom shared by Cobbs and King, and that people came to the house to purchase crack cocaine. The court concluded that the enhancement was appropriate and denied the objection.

U.S.S.G. §2D1.1(b)(1) provides for a two-level increase in the base offense level "if a dangerous weapon (including a firearm) was possessed" during the commission of a felony drug offense. The government must show by a preponderance of the evidence that the dangerous weapon was possessed during relevant conduct. *United States v. Johnson*, 344 F.3d 562, 565 (6th Cir. 2003); *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003). Relevant conduct under the Guidelines includes "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Faison*, 339 F.3d at 520 (citing U.S.S.G. §1B1.3(a)(2)).

The enhancement applies if the defendant actually or constructively possessed the weapon. *United States v. Bender*, 265 F.3d 464, 474 (6th Cir. 2001). A defendant constructively possesses a firearm if he has ownership, dominion or control over the firearm itself, or dominion over the

---

[2] Any error in this regard was to King's advantage, because the burden-shifting component found in §2D1.1(b)(1), discussed *infra.*, is not present in §2K2.1(b)(1). *See United States v. Hardin*, 248 F.3d 489, 496-97 (6th Cir. 2001)(discussing distinction).

premises where the firearm is located. *United States v. Galvan*, 453 F.3d 738, 742 (6th Cir. 2006). The enhancement may also apply if a member of the conspiracy possessed the firearm and the member's possession was reasonably foreseeable by the other members in the conspiracy. *Id*. (citing *United States Owusu*, 199 F.3d 329, 347 (6th Cir. 2000).

Application Note 3 to U.S.S.G. §2D1.1 states that the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Note 3 further states, as an example, that the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet. *Id*. Once the government proves that the weapon was possessed during the commission of a felony drug offense and that the weapon was present, "a presumption arises that such possession was connected to the offense." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)(quoting *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991)). Defendant may rebut this presumption by demonstrating that it is clearly improbable that the firearm was connected to the offense. *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004). In making this determination, the court may consider several factors, including the proximity of the firearm to the drugs, the type of firearm involved, whether the firearm was loaded and any alternative purpose offered to explain the presence of the firearm. *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002).

In this case, there was sufficient evidence to show that King possessed weapons during the conspiracy offense. Cobbs and King sold drugs at their residence on Youker Road. King acknowledged ownership of the handguns which were found in the safe located in the master bedroom shared by the defendants. Two of the firearms were loaded. The safe also contained $2,000 in cash. The safe was located in the master bedroom on a shelf near the dresser where a

significant amount of crack cocaine, packaged for distribution, was stored. Rifles and a shotgun were also found in plain sight in the bedroom. These guns included an AR-15 rifle belonging to Cobbs which had been illegally converted to an automatic weapon, with ammunition near at hand. King could reasonably foresee the use by Cobbs of this firearm in the conspiracy.

King offered evidence that her family belonged to a shooting club. However, even assuming that this partially explained her ownership of the handguns, it simply shows that she belonged to a club where she could learn how to use them. It does not detract from the fact that these handguns, as well as the illegal AR-15 assault rifle belonging to Cobbs, her co-conspirator, were located in close proximity to drugs and drug proceeds. King failed to offer evidence sufficient to demonstrate that it was clearly improbable that the firearms found in the master bedroom were connected to the conspiracy.

The district court's determination of the facts establishing a sufficient basis for the firearm enhancement was not clearly erroneous, and the district court did not err in applying that enhancement.

B.  Relevant Conduct - Drug Quantity

King argues that she should not have been held accountable for the crack cocaine found in the sock. This court reviews the factual findings of a district court regarding the amount of drugs for which a defendant is held accountable only for clear error. *United States v. Critton*, 43 F.3d 1089, 1098 (6th Cir. 1995). Findings on which the sentence is based must be supported by a preponderance of the evidence. *Id*.

In calculating King's sentencing range under the Guidelines, the probation officer found that King's criminal activity involved at least 47.1 grams of cocaine base, resulting in a base offense level

of 30 for offenses involving at least 35 but less than 50 grams of cocaine base. The probation officer calculated: 1) one gram purchased by Detective Salisbury from Cornell on December 28, 2004; 2) 1.4 grams purchased by Detective Salisbury from Cornell on January 6, 2005; 3) 1.2 grams purchased by Detective Salisbury from Cornell on January 10, 2005); and 4) 44.5 grams of cocaine base found in a sock in the residence.[3] The district court noted that Cobbs and King resided together at the same residence, and that King participated in the distribution of crack cocaine from the residence. The district court concluded that the quantity of crack cocaine being considered as relevant conduct was reasonably foreseeable to King as a co-conspirator, and accepted the quantity findings of the probation officer.

Relevant conduct in this case includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the offense of conviction[.]" U.S.S.G. §1B1.3(a)(1); *United States v. Settle*, 414 F.3d 629, 632 (6th Cir. 2005). Pursuant to U.S.S.G. §1B1.3(a)(1)(B), King's guideline sentence "in the case of a jointly undertaken criminal activity" is based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. §1B1.3(a)(1)(B). King is responsible for the drug quantities in which she is directly involved, and any quantity that is a reasonably foreseeable consequence of the conspiracy. *Caver*, 470 F.3d at 246-47. Under the Guidelines, "a participant is responsible for other conspirators' conduct only if that conduct was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal

---

[3] The parties stipulated at trial that the crack cocaine found in the sock weighed 36.75 grams, excluding the packaging materials. It is not clear if the figure of 44.5 grams used by the probation officer included the packaging materials; counsel did not point out the discrepancy at the sentencing hearing. However, even if we apply the lesser amount of 36.75 grams, that amount, if considered as relevant conduct, would still be sufficient to result in a base offense level of 30.

activity." *United States v. Bartholomew*, 310 F.3d 912, 923 (6th Cir. 2002)(quoting *United States v. Jenkins*, 4 F.3d 1338, 1346 (6th Cir. 1993)); U.S.S.G. §1B1.3, Application Note 2.

The record contains sufficient evidence to support by a preponderance of the evidence the district court's finding that the crack cocaine found in the sock could be considered as relevant conduct in King's case. King was actively involved with Cobbs in the conspiracy to sell crack cocaine. There was testimony that both Cobbs and King sold crack cocaine from their residence over a period of at least two months prior to their arrest. The crack cocaine was located in the master bedroom shared by them, and was packaged for distribution. The amount of cocaine found in the sock was a conservative figure for relevant conduct when viewed in light of other evidence concerning the scope of the conspiracy. For example, Brandon Way testified that he purchased crack cocaine from Cobbs and King on at least fifteen occasions, each time purchasing a "teener," approximately 1.7 grams, or occasionally an "eight-ball," approximately 3.5 grams. Even using the lower figure, this adds up to 25.5 grams of crack cocaine sold just to Way. Rebecca Reid and Jeremy Shafer also purchased crack cocaine from King and Cobbs during the relevant period.

The district court's determination that the quantity of drugs considered as relevant conduct was sufficient to place King in a base offense level of 30 was not clearly erroneous.

IV.  Conclusion

In accordance with the foregoing, the judgments and sentences entered in *United States v. Cobbs* and *United States v. King* are AFFIRMED.