**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0391n.06

**Case Nos. 15-1712/1761/2278**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jul 03, 2017

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| MOHAMED AYOUB, MOHAMED FARAJ, | ) | |
| and FOUAD FARAJ, | ) | |
| | ) | |
| Defendants-Appellants. | | **O P I N I O N** |

**BEFORE: BOGGS, SUHRHEINRICH, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Mohamed Faraj, along with several of his cohorts, operated a marijuana and prescription-drug enterprise in the Dearborn and Warrendale neighborhoods of Detroit, Michigan. Beginning in 2009, the venture spanned five years and involved a rotating cast of players. In 2013, the government indicted eight individuals in connection with the operation on drug conspiracy-related charges and numerous convictions followed. Now before the court are the appeals of three of the conspiracy's key members: Mohamed Faraj—"Mojo" as he was called—was the group's founder and ring leader; Fouad Faraj owned the "safe house" and primary headquarters of the organization; and Mohamed Ayoub served as "street captain" in the conspiracy's later life. All three defendants were convicted under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), and 846 of conspiracy to distribute controlled substances, and Mohammed Faraj was convicted of engaging in a continuing criminal

enterprise under 21 U.S.C. § 848 and use of a communication facility in facilitating the commission of a violation of the Controlled Substances Act under 21 U.S.C. § 843(b)(3). They raise various claims on appeal challenging evidentiary rulings, the sufficiency of the evidence to sustain their convictions, and the calculation of their resulting sentences. For the reasons set forth below, we affirm the district court on all counts as to Mohamed Faraj and Mohamed Ayoub. We affirm Fouad Faraj's conviction, but vacate his sentence and remand his case for resentencing.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

This drug conspiracy began in 2009 when Mojo enlisted his childhood friend Hafez Hammoud to assist him in selling marijuana and prescription drugs. The pair used Fouad's home on Rutherford Street in Warrendale as the hub of their operations, which worked like this: Mojo received orders from customers on a designated drug phone and directed them to Fouad's house for pick-up. Mojo then alerted Hammoud of incoming buyers, and Hammoud approached the vehicles and completed the sales.

Approximately two months into their endeavors, Mojo and Hammoud decided to professionalize their operations. First, they upgraded to selling "kush," a more lucrative and potent strain of marijuana. Second, they began packaging the kush in glass vials, rather than plastic baggies, in order to better preserve the kush and enhance its display quality. Originally purchased from a smoke shop down the street, and later ordered in bulk directly from the manufacturer, Thornton Plastics, these glass vials became the signature of their operation. As customers and profits began to grow, Mojo and Hammoud expanded their crew by hiring three 13-to-17-year-old kids from the block—"Moley," "Peanut," and "AK"—to be their "drug runners." The operation also needed more space. While Fouad's home on Rutherford was still

the group's headquarters, during late 2009 and early 2010 they began utilizing vacant homes on the street for packaging and selling purposes, including a second home owned by Fouad.

Continuing to grow in numbers, the group began to find a routine. Their products included vials of marijuana, "eighths," which contained larger quantities of the drug sold in baggies, and prescription drugs, such as Vicodin. The marijuana was packaged at night in preparation for the next day's sales. Workers sold continuously, seven days a week, from 9 a.m. until 2 a.m., and utilized tally sheets to track their sales. Hammoud accumulated the drug proceeds from workers and reported to Mojo nightly, who divided the spoils—typically between $3,000 and $4,000 per day—keeping the largest cut for himself. Fouad also received a portion of these daily proceeds in exchange for allowing the group to use his home as its headquarters and for the supervisory role he played in the enterprise.

While Fouad's home offered shelter from police detection, Mojo armed his workers with weapons, stashed throughout the block, to protect them from rival drug dealers. Mojo ensured that his enterprise monopolized the neighborhood and ordered workers to verbally or physically assault others who attempted to encroach on their territory or threaten to reveal their operations to police. For example, in May 2010, Mojo ordered Hammoud to assault a local homeless man, Mahmoud Harajli, after it was rumored that Harajli was informing on the organization to police.

In the spring and fall of 2010, after a series of arrests and an increased police presence on Rutherford Street, Mojo and his crew embarked on a series of relocations around Dearborn and Warrendale, utilizing a pub a few blocks away as a front for sales, and later selling out of their cars and occupying vacant homes in the area. They returned to Rutherford for short intervals during this transitory period, although they began using the alleyway behind the street to consummate sales, rather than the front of Fouad's home. Even with this added element of

covertness, however, Fouad was uneasy about the conspiracy's continued use of his home as its headquarters, and he demanded a bigger cut of the drug proceeds if the operation was to remain there. Mojo refused, instead moving the group's distribution point to his own apartment on Greenview Avenue in Warrendale.

It was at this point that the group's composition began to change as well. Hammoud took a year hiatus, and when he returned, Mohamed Ayoub had assumed his role of "street captain," overseeing worker operations and collecting drug proceeds for Mojo. The group returned to Rutherford Street one final time in late 2011, this time using Fouad's second—and vacant— home as the front for its operations. The March 2012 arrest of Hammoud, however, signaled the beginning of the end for Mojo's enterprise. Police had been gathering information on this group over the years, executing search warrants, confiscating marijuana and weapons, and arresting and charging many of the conspirators with possession-related crimes. However, when Hammoud decided to cooperate in late 2012, the police were finally able to build a comprehensive case that culminated in a search of Mojo's and Fouad's homes in August 2013. At Mojo's, the police found plastic baggies, packaged and unpackaged marijuana, and a phone bill linking him to the conspiracy's drug phone. At Fouad's, police recovered $16,896 in cash and a loaded firearm.

On July 31, 2013, a grand jury indicted Mojo and Fouad on several counts, and a few months later, on November 13, a second grand jury charged Ayoub. Mojo and Fouad were charged with engaging in a continuing criminal enterprise, 21 U.S.C. § 848(a) & (c). All three defendants were charged with conspiracy to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), 846, and with possession of a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c). Mojo was also charged with use of a communication facility in facilitating the commission of a violation of the Controlled Substance Act, 21 U.S.C. § 843(b).

In late October through November 2013, Mojo, Fouad, and Ayoub were tried together to a jury. The trial lasted four weeks and involved over 70 witnesses and 300 exhibits. After nine days of deliberations, the jury found all three defendants guilty of conspiring to distribute controlled substances. Mojo and Fouad were also found guilty of operating a criminal enterprise, but Fouad was later acquitted of this charge after the trial judge granted a Rule 29 motion in his favor. Fouad and Ayoub were acquitted of the firearm charge, and the jury was unable to reach a verdict on that charge as to Mojo. Finally, Mojo was convicted for the use of a phone in connection with a violation of the Controlled Substances Act.

## II.     EVIDENTIARY CHALLENGES

On appeal, defendants challenge various evidentiary rulings. First, Mojo and Ayoub argue that the district court erred in denying their motion to recall Hammoud, the government's witness, so that they could cross-examine him about a recent domestic violence allegation. Second, Mojo claims that out-of-court statements made by Mahmoud Harajli were improperly admitted as excited utterances and infringed on his rights under the Confrontation Clause of the Sixth Amendment. Third, Fouad alleges that the admission of evidence of his failure to file tax returns constituted improper character evidence. We affirm the decisions of the trial court as to each of defendants' challenges.

### A. Standard of review

A district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004). "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *Id.* (internal quotation marks omitted). Such an abuse of discretion occurs "when a district court relies on clearly erroneous findings of fact, improperly

applies the law or uses an erroneous legal standard." *United States v. Barnes*, 822 F.3d 914, 923 (6th Cir. 2016) (quoting *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005)). If we do find an abuse of discretion, we will not reverse if the error is harmless, "meaning that it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006) (internal quotation marks omitted).

### B. Refusal to Recall Witness Hafez Hammoud

Mojo and Ayoub argue that the trial court erred when it denied their motion to recall government witness Hammoud so that they could impeach his testimony that he was a "changed, law-abiding man" with a police report accusing him of domestic violence. In denying the motion, the court held the police report was inadmissible extrinsic evidence under Federal Rule of Evidence 608(b) and the court precluded defendants from inquiring into the incident under Federal Rule of Evidence 403 because it had little probative value and was likely to be unduly prejudicial. *See* R. 210, Order at 2–3, PIDs 933–34. This ruling was not an abuse of discretion.

On October 14, prior to the commencement of trial, the government sent defendants a police report filed by Hammoud's girlfriend, which contained inflammatory allegations of domestic violence. Co-defendant Abed Faraj referred to this report in his trial brief, but neither Mojo nor Ayoub filed a motion in limine requesting leave to use this evidence at trial. On October 30, the government called Hammoud to the stand, at which time counsel for defendants were able to cross-examine him, where, according to the trial court, they were able to "damage [] sufficiently" his credibility and demonstrate that his testimony was "capable of disbelief." R. 271, Trial Tr. at 9, PID 2567; R. 273, Trial Tr. at 25, PID 2980. Ayoub's counsel

was the only one to raise the domestic violence allegations, but withdrew his question when the government objected.  R. 270, Trial Tr. at 168, PID 2534.

Hammoud was discharged from the stand on Friday, October 31, and on Monday—the next day of trial—Ayoub moved to recall Hammoud to the stand.  Defendants were not only aware of this report's existence prior to Hammoud taking the witness stand—and could have filed a motion in limine requesting a ruling on its admissibility—but also could have pressed the matter during cross-examination and requested a ruling on the objection prior to Hammoud being excused from the stand, rather than simply withdrawing the question and changing their minds over the weekend.

### 1.  *Rule 608(b)*

Under Rule 608(b), "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  Because the police report filed by Hammoud's girlfriend was extrinsic evidence and not a "criminal conviction," it falls squarely within the ambit of this rule.

Rule 608(b) also states that "the court may, on cross-examination, allow [specific instances of conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness" of a witness.  However, such allowance is subject to Rule 403 balancing. *See* Advisory Committee Notes to Fed. R. Evid. 608(b) (observing that "the possibilities of abuse are substantial," and that "the overriding protection of Rule 403" should serve as a safeguard). Whether to permit cross-examination about specific conduct that may be probative of a witness's truthfulness is thus within the district court's discretion. *Boggs v. Collins*, 226 F.3d 728, 744 (6th Cir. 2000).

Here, the district court appropriately exercised its discretion in denying defendants the opportunity to question Hammoud about the police report. The court balanced the probative value of information contained in the report against the potential danger of unfair prejudice and found the probative value to be low, as the allegations of domestic violence were not related to Hammoud's testimony about the conspiracy and were made subsequent to any events at issue in the case. Additionally, the report does not directly refute Hammoud's testimony that he was a "changed, law-abiding man" because it contains mere allegations and provides no conclusive proof that he actually broke the law.

If questioning was allowed on the uncorroborated accusations, jurors might place undue weight on the "highly prejudicial" charges, which risked unfairly damaging Hammoud's entire testimony. *See* R. 273, Trial Tr. at 26, PID 2981. To eliminate this danger, the court noted, it "would have to conduct a mini-trial" to establish the truth of the victim's statements which "would be time consuming, confusing, and wholly tangential to any of the underlying facts of the present case." *Id.* at 2–3, PIDs 933–34; *see also United States v. Richardson*, 793 F.3d 612, 629 (6th Cir. 2015) (noting that "[t]his type of collateral 'mini-trial' is precisely what Rule 608(b) is intended to prevent, and why the decision of whether or not to permit such cross-examination should be, and is, within the court's discretion"), *abrogated on other grounds by Richardson v. United States*, 136 S. Ct. 1157 (2016). Because the report added little to no value, and created a danger of unfair prejudice, disallowing this line of questioning was not an abuse of discretion. *See Barnes*, 822 F.3d at 923 ("A district court is granted 'very broad' discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence.") (internal quotation marks omitted).

### 2. *Rule 404(b)*

Prior to withdrawing his question to Hammoud at trial about the police report, Ayoub's counsel argued that the domestic violence allegations "go[] to [Hammoud's] credibility." R. 270, Trial Tr. at 167, PID 2533. And although credibility determinations of witnesses are properly analyzed under Rules 608, as they were by the trial court in this case, Mojo and Ayoub alternatively attempt to shoehorn their credibility argument into Rule 404(b) by claiming that the allegations should have been admitted as character evidence. However, because this re-characterization is unconvincing and results in nothing more than a propensity-for-violence argument, it was proper and not an abuse of discretion for the trial judge to ground his decision in Rule 608(b).

Rule 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." FED. R. EVID. 404(b). However, such evidence may be offered for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* Specifically, defendants argue that the domestic violence allegations demonstrate that Hammoud is "capable of violence on his own" and support the notion that he assaulted Mahmoud Harajli entirely on his own accord rather than on orders from Mojo. *See* Mojo Br. at 36; Ayoub Br. at 45. In their briefs on appeal, defendants do not specify which of the admissible non-character purposes their theory falls under, but at oral argument, counsel for Mojo suggested that the domestic violence allegations evince a motive to resort to violence, or alternatively, reinforce the identity of an individual willing to use physical violence by hand. But no matter how defendants seek to recast it, the essence of their argument is that the police report demonstrates Hammoud is a violent person; therefore, it is more likely

that he exhibited this violence when he attacked Harajli, rather than reluctantly doing so on orders from Mojo. Defendants present no evidence connecting Hammoud's attack on Harajli with the allegations of domestic violence other than the fact that both events demonstrate Hammoud's tendency to resort to violence. But his "motive" to commit violence or his violent-prone "identity" is the exact type of propensity evidence that Rule 404(b) precludes.

Moreover, even assuming a proper, non-character purpose for this evidence, defendants' argument fails both remaining steps of the three-part test used to determine whether evidence is admissible under Rule 404(b). *See United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003) (holding that there must be sufficient evidence that the prior bad act occurred; the prior bad act must be probative of an issue other than character; and if steps one and two are met, the district court must have correctly decided that the probative value of the evidence is substantially outweighed by its potential prejudicial effect). Here, there was insufficient evidence that Hammoud was guilty of domestic violence, and as discussed above, the district court properly excluded the evidence pursuant to Rule 403 balancing. Therefore, it was not an abuse of discretion to deny defendants' motion to recall Hammoud.

### 3. *Confrontation Clause*

Finally, to the extent that defendants raise a Confrontation Clause argument, *see* Mojo Br. at 34; Ayoub Br. at 43, this claim lacks merit because defendants *did* have the opportunity to cross-examine Hammoud extensively at trial, effectively calling his credibility into question. *See, e.g.,* R. 271, Trial Tr. at 9, PID 2567; R. 273, Trial Tr. at 25, PID 2980.

### C. ADMISSION OF HARAJLI STATEMENTS

Next, Mojo argues that the district court erred in admitting out-of-court statements made by Mahmoud Harajli, who, according to Mojo, "claimed that [Mojo] ordered Hammoud to break his arms in retribution for allegedly speaking to police." Mojo Br. at 39. As an initial matter,

Harajli's statements do not even say what Mojo claims they do. In fact, they don't implicate Mojo at all. Thus, the trial court did not abuse its discretion in admitting these statements. Similarly, Mojo's Confrontation Clause rights were not violated because the statements were not adverse to Mojo and were not testimonial in nature. We therefore affirm the decision of the trial court.

Harajli, a homeless man who frequented Rutherford Street, was seen by emergency medical services personnel sometime in the late afternoon on May 22, 2010, and taken to the hospital, where he arrived at 4 p.m. for treatment of a broken left arm. Harajli told his treating nurse that "his neighbors who deal drugs beat him up with a two-by-four earlier [that day]." R. 275, Trial Tr. at 17, PID 3336. The nurse's notes, which were recorded at 5:25, described Harajli's condition: "The patient will not keep eyes open fully. Patient slurring words at time at whisper level, hard to understand. Patient states he cannot keep eyes open due to pain . . . Patient states he's unsure if he had any [loss of consciousness]." *Id.* at 16, PID 3335. At 5:40 p.m., Harajli gave the first statement that was admitted as an excited utterance. He said, "[t]hey think I snitched on them but I didn't." R. 211, Order at 2, PID 936. Harajli then made a second statement at 6:32 p.m.: "An acquaintance beat me up because he thinks I tell the cops he sells drugs." R. 273, Trial Tr. at 11, PID 2966; R. 211, Order at 2, Page ID 936.

The trial court allowed the statements, finding them relevant to the conspiracy charge and admissible under Rule 803(2) as excited utterances excepted from the rule against hearsay. Mojo now challenges this ruling, claiming the statements do not qualify as excited utterances and that his Confrontation Clause rights were violated.

1. *Statements as Excited Utterances*

Federal Rule of Evidence 803(2) excepts from the rule against hearsay "statement[s] relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." These statements are inherently reliable because such "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Advisory Committee Notes to FED. RULE OF EVID. 803. Thus, the crucial question in determining whether a statement qualifies as an excited utterance is "[w]hether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007) (quoting *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1058 (6th Cir. 1983)). To aid in this inquiry, this circuit has developed a three-part test: (1) there must be an event startling enough to cause nervous excitement; (2) the statement must be made before there is time to contrive or misrepresent; and (3) the statement must be made while the person is under the stress of excitement caused by the event. *Haggins*, 715 F.2d at 1057.

The trial court applied the *Haggins* test and concluded, as to the first and second elements, that (1) being hit with a "2 x 4" suffices as a "startling event," and (2) even though several hours passed between the assault and the statements, this was not dispositive because Harajli was unconscious during much of this time, giving him little time to concoct a story. R. 211, Order at 2, PID 936. Finally, the court also found the third element satisfied, reiterating that Harajli was severely beaten and remained in severe pain in the aftermath of the attack. *Id.* at 2–3, PID 936–37. On appeal, Mojo concedes the first two prongs—the existence of a startling event and the lack of time to misrepresent—and argues only that Harajli was no longer under the stress of excitement. Mojo Br. at 43–44.

"Relevant factors in determining whether a speaker remains under the stress of the excitement include (1) the lapse of time between the event and the declarations; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 380 (6th Cir. 2009) (quoting *Maggard v. Ford Motor Co.*, 320 F. App'x 367, 374 (6th Cir. 2009)). Here, many of these factors militate in favor of finding that Harajli was under the stress of excitement. As to his physical and mental state, the nurse who treated Harajli said that he was "complain[ing] of head pain and left arm pain," was "slurring words," "fall[ing] asleep quickly," and "[could not] keep his eyes open due to pain." R. 275, Trial Tr. at 16–18, Page IDs 3335–37. These physical symptoms were a direct result of the attack by Hammoud and indicate that Harajli was not in a state where he had time to engage in the "reflective thought" that the excited utterance exception guards against. *See Arnold*, 486 F.3d at 208; *see also Haggins*, 715 F.2d at 1058 ("[P]hysical factors such as shock, unconsciousness or pain, may prolong the period in which the risk of fabrication is reduced to an acceptable minimum.") (internal quotation marks omitted).

Additionally, the characteristics of the event and the subject matter of the statements reinforce the conclusion that Harajli remained under the stress of excitement. A statement is more likely to be made under the stress of excitement when it involves the startling event itself. *Maggard*, 320 F. App'x at 375. Here, Harajli was physically assaulted by Hammoud and, despite being removed from the location where it took place, was reminded of that trauma by the fact that he remained in a hospital bed in severe pain. *See id.* at 374 (finding that the nature of the event itself supported a finding that declarant remained under the stress of excitement for a significant period of time). Furthermore, the statements Harajli made to the nurse relate to the

startling event—why Hammoud attacked him in the first place. *See Biegas*, 573 F.3d at 381 ("When the subject matter of the statement involves the startling event itself, the subject matter supports a finding that the declarant was still under the stress of the accident." (quoting *Maggard*, 320 F. App'x at 375)).

Even the lapse of several hours between the attack and the statements does not undermine this conclusion. "[O]ur cases do not demand a precise showing of the lapse of time between the startling event and the out-of-court statement. The exception may be based solely on '[t]estimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset.'" *United States v. Davis*, 577 F.3d 660, 669 (6th Cir. 2009) (alterations in original) (quoting *Arnold*, 486 F.3d at 185). We have upheld the admission of statements made after time lapses of similar duration. *See, e.g., United States v. Baggett*, 251 F.3d 1087, 1090 n.1 (6th Cir. 2001) (applying the exception to statements made several hours after the event); *United States v. Tabaja*, 91 F. App'x 405, 410 (6th Cir. 2004) (eleven hours); United *States v. Green*, 125 F. App'x 659, 662 (6th Cir. 2005) (three hours).

Based on an analysis of the relevant factors, we cannot conclude that the district court abused its discretion in determining Harajli was still under the stress of excitement when he made the statements at issue. *See Arnold*, 486 F.3d at 184 (quoting *Haggins*, 715 F.2d at 1058).

### 2. *Confrontation Clause*

Mojo also argues that his Confrontation Clause rights were violated since he was not given the opportunity to cross-examine Harajli about his statements. *See* Mojo Br. at 40–41. The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const.

amend. VI. Requiring that defendants are able to question those who "bear testimony" against them, this Clause bars the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 51–54 (2004) (emphasis added). Thus, to trigger a violation, a statement must be (1) testimonial and (2) hearsay. *United States v. Napier*, 787 F.3d 333, 348 (6th Cir. 2015).

In this case, Harajli's statements made to medical personnel while receiving treatment for a broken arm were not testimonial. "Testimony" is defined as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (alteration in original) (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). And "[a] statement is testimonial if a reasonable person in the declarant's position would have anticipated the use of the statement in a criminal proceeding." *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011). For example, the Confrontation Clause bars admission of "formal statement[s] to government officers," but not "off-hand, overheard remark[s]" or "casual remark[s] to an acquaintance." *See Crawford*, 541 U.S. at 51. Other examples of testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a formal trial." *Id.* at 68. However, statements made to police in response to ongoing emergencies are not testimonial. *Davis v. Washington*, 547 U.S. 813, 822 (2006). Ultimately, the crux of the inquiry is whether a statement was "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

Here, Harajli's declarations—"[t]hey think I snitched on them but I didn't," and "an acquaintance beat me up because he thinks I tell the cops he sells drugs"— bear no resemblance

to the hallmarks of testimonial statements. For starters, Harajli made the statements while lying in a hospital bed, in extreme pain, and slipping in and out of consciousness. This is not the type of "solemn declaration" that qualifies as "testimony" under the Clause. *Crawford*, 547 U.S. at 51. Further, to the extent Harajli was lucid, there would be no reason for him to divine that his statements would later be used to convict Mojo of drug conspiracy crimes, especially given that (1) his statements do not mention Mojo at all, and (2) at the time of the statements, Harajli had no way of knowing when, or if, Mojo would be charged with those crimes. In addition, the statements were made to a treating nurse who was attempting to elicit information from Harajli regarding his physical condition. The nurse's medically based purpose for talking with Harajli was entirely devoid of an underlying prosecutorial motive. *See Davis*, 547 U.S. at 827 (finding that statements necessary to "*resolve* the present emergency, rather than simply to learn . . . what had happened in the past" were more likely to be nontestimonial); *see also Giles v. California*, 554 U.S. 353, 376 (2008) (noting that "statements to physicians in the course of receiving treatment would be excluded [from trial], if at all, only by hearsay rules" since they are nontestimonial).

Finally, the excitement-wrought and pain-filled hospital environment in which Harajli found himself was far removed from the more formal, interrogative setting that typically exists when a witness testifies at trial, making Harajli's statements a poor substitute for trial testimony and yet another reason why they are not testimonial. *Bryant*, 562 U.S. at 377; *see also Davis*, 547 U.S. at 827 (contrasting formal, testimonial statements made at a station house with informal, "frantic," and nontestimonial statements made to a 911 operator). Similar to how an ongoing emergency presents a reason for a declarant to make a statement unrelated to future criminal prosecution, excited utterances are by definition reflexive responses to startling events,

and likewise are typically not made with an eye towards future litigation. *See Bryant*, 562 U.S. at 361 (finding that "[i]mplicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination" and concluding that "[t]his logic is not unlike that justifying the excited utterance exception in hearsay law").

In sum, Harajli's statements are much more akin to "off-hand remarks," rather than "formal statements to government officers," and thus are not testimonial in nature. Their admission into evidence did not contravene Mojo's constitutional right "to be confronted with the witnesses against him" because the statements do not even implicate him in the attack on Harajli and because they at most merely corroborate testimony previously given by Hammoud at trial.

## D. Admission of Evidence of Fouad's Failure to File Tax Returns

Fouad argues that it was error for the trial court to allow into evidence a letter from the IRS stating that he did not file tax returns for 2008 to 2011. Fouad Br. at 21. The trial court determined that evidence of Fouad's failure to file tax returns was admissible under Federal Rule of Evidence 404(b) because it was probative of his willful participation in the conspiracy: "[H]e knew he was making money from possibly the illicit sale of marijuana and didn't want the government to know about that." R. 280, Trial Tr. at 12, PID 4199. This decision was not an abuse of discretion.

As stated above, when reviewing evidentiary determinations under Rule 404(b), we employ a three-part test: First, there must be sufficient evidence that the prior bad act occurred; second, the prior bad act must be probative of an issue other than character; and third, if steps

one and two are met, the district court must have correctly decided that the probative value of the evidence is substantially outweighed by its potential prejudicial effect. *Jenkins*, 345 F.3d at 937.

The government easily met step one because it presented a letter from the IRS confirming Fouad's failure to file returns from 2008 to 2011. *See* R. 281, Trial Tr. at 85–86, PID 4446–47. As to step two, as the trial court explained, the failure to file returns suggested Fouad was conscious of the fact that, despite receiving large sums of money, he should not report this income on his taxes because doing so would alert the government to his illegal dealings. This circuit has previously upheld the admission of this type of evidence. The failure to file tax returns is admissible in narcotics cases when linked to extravagant spending to "create[] the inference that the defendant does not possess a legitimate source of income to support his affluent lifestyle, and therefore, the income must originate from narcotics operations." *United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) (quoting *United States v. Carter*, 969 F.2d 197, 201 (6th Cir. 1992)) (collecting cases); *see also United States v. Cobbs*, 233 F. App'x 524, 538 (6th Cir. 2007) (allowing introduction of tax returns to show that Cobbs's legitimate income was insufficient to cover his gambling expenditures to "invit[e] the inference that the money used in gambling came from illegal narcotics activity").

The government presented evidence demonstrating that Fouad engaged in a lavish lifestyle during his time in the conspiracy. Beginning in 2010, he conducted extensive renovations of his home on Rutherford Street. *See* R. 277, Trial Tr. at 48–51, PIDs 3825–28; R. 269, Trial Tr. at 199–200, PIDs 2352–53. Fouad installed new appliances, flooring, and granite countertops, and enjoyed amenities like multiple flat screen TVs, leather couches, and a Jacuzzi tub. *Id.* at 50–51, PIDs 3827–28. Additionally, Fouad paid for a brand new brick facade for his home and outfitted his conversion van with a chameleon paint job, hardwood flooring, a

refrigerator and fully stocked bar, and custom leather seating. R. 269, Trial Tr. at 180–81, PIDs 2333–34.

The government likewise demonstrated that these expensive spending habits were likely funded by drug proceeds, as Hammoud testified that Fouad had no job from 2009 to 2013, and Fouad does not refute this assertion. Moreover, when the police searched Fouad's home they recovered $16,896 in cash from a bedroom nightstand. *See* R. 278, Trial Tr. at 195, PID 4166. Altogether, the evidence of Fouad's expensive spending, his possession of large sums of cash, and the failure to report any source of income on his taxes to justify such expenditures "creates the inference that . . . the income must originate from narcotics operations." *See Jackson-Randolph*, 282 F.3d at 377 (quoting *Carter*, 969 F.2d at 201).

Lastly, in step three of the analysis, the court was within the bounds of its "broad discretion" in finding the evidence admissible under Rule 403. *See United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007) (quoting *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989)). "[U]nfair prejudice does not outweigh probative value if three factors are met: (1) there is other credible evidence . . . of illegal activity, (2) the money spent was not available to the defendant from a legitimate source, and (3) the accumulation of great wealth or extravagant spending relates to the period of alleged illegal activity." *Cobbs*, 233 F. App'x at 538–39 (quoting *Jackson-Randolph*, 282 F.3d at 378). Here, there is considerable evidence connecting Fouad to the conspiracy, no evidence that Fouad held a job apart from his role in the operations from 2009 to 2013, and his home renovations were completed in 2010, during the period of the conspiracy. Based on these facts, it was not an abuse of discretion for the trial court to admit evidence of Fouad's failure to file his tax returns.

### III.     SUFFICIENCY-OF-THE-EVIDENCE CLAIMS

Mojo and Fouad challenge the sufficiency of the evidence to support their convictions on various charges:  Mojo for engaging in a continuing criminal enterprise, 21 U.S.C. § 848(a) and (c), and Fouad for conspiring to distribute marijuana, 21 U.S.C. §§ 841, 846.  In addition, Mojo seeks a judgment of acquittal as to the firearm charge under 18 U.S.C. § 924(c), even though the jury did not reach a verdict on this count at trial.  We affirm that there was sufficient evidence to convict Mojo and Fouad on their respective charges and lack jurisdiction to hear Mojo's request for a motion of acquittal because there has not been a final judgment below.

#### A.  Standard of Review

We review de novo a challenge to the sufficiency of the evidence in a criminal case. *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010).  However, we are to view the evidence below in light most favorable to the prosecution and ask whether any rational trier of fact could have found the contested elements of a crime beyond a reasonable doubt.  *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[A]n appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010) (alteration in original) (internal quotation marks omitted).  The defendant bears a "very heavy burden" when he challenges the sufficiency of the evidence, as this court will not independently weigh the evidence nor make credibility determinations of the witnesses who testified before the jury at trial.  *Garcia*, 758 F.3d at 718 (quoting *United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005)).  Further, circumstantial

evidence alone, including the uncorroborated testimony of an accomplice, is sufficient to sustain a conviction. *Wettstain*, 618 F.3d at 583.

### B. Mohamed Faraj

#### 1. *Continuing Criminal Enterprise*

In convicting Mojo of engaging in a continuing criminal enterprise, the jury was required to find five elements beyond a reasonable doubt: (1) that the defendant committed a felony violation of federal narcotics laws; (2) that the violation was part of a continuing series of three or more drug offenses committed by the defendant; (3) that the defendant committed the series of offenses in concert with five or more persons; (4) that the defendant acted as an organizer, supervisor, or manager of these five or more persons; and (5) that the defendant obtained substantial income or resources from this series of violations. *United States v. Burns*, 298 F. 3d 523, 535 (6th Cir. 2002). After two weeks of deliberations, the jury found Mojo guilty on this charge, and the record fully supports this conclusion.

On appeal, Mojo only challenges the sufficiency of the evidence presented in regard to the fourth element, specifically, whether he was an "organizer, supervisor, or manager" of the conspiracy. *See* Mojo Br. at 48–49. He argues that he had nothing more than a buyer-seller relationship with other members of the conspiracy and that, while "a whole lot of folks bought their 'kush' from [Mojo]," there was no proof that he "organized and controlled anyone." *See id.* at 49. Although Mojo is correct that a buyer-seller relationship, standing alone, is insufficient to make one an organizer, supervisor, or manager, *United States v. English*, 925 F.2d 154, 157 (6th Cir. 1991) (per curiam), even a cursory review of the record reveals that Mojo's involvement was much more extensive than he acknowledges.

To be an organizer, supervisor, or manager, a defendant must have exercised a certain degree of control over others, for example, by "instructing them as to the language they could use to refer to drugs over the phone, by setting the prices for the drugs, by dictating whether the sales would be cash or credit, by telling them who they could sell the drugs to, by forcing his customers to pay promptly, and by dictating the quality of the drugs." *See id.* at 157. In addition, a defendant exercises supervision over anyone who brokers or stores drugs on his behalf, collects or launders proceeds, or who simply knows about the drug operation and takes orders directly from the defendant relating to that operation. *United States v. Ward*, 37 F.3d 243, 247 (6th Cir. 1994).

The record is replete with instances of Mojo engaging in these exact behaviors. For starters, there is evidence that he exercised control over the client base. He owned the drug phone that customers called when ordering, R. 275, Trial Tr. at 76, PID 3395, and he specified to workers who should receive the drugs. *See, e.g.,* R. 269, Trial Tr. at 69, PID 2222 ("Mojo would call me, [and] tell me when to serve [the customers] up . . . ."); R. 273, Trial Tr. at 147, PID 3102 ("Mojo would call me and tell me to drop [marijuana] off . . . to his brother . . . ."). Next, Mojo dictated the quality of the drugs sold. He, along with Hammoud, decided to upgrade the type of marijuana sold—to kush—and the packaging it was sold in—to glass vials. Mojo also took responsibility for bulk ordering these vials from the manufacturer and distributing them to workers for filling. R. 269, Trial Tr. at 89, PID 2242.

Described as "the ultimate head person," Mojo also controlled the terms under which the drugs were sold, for example, by expecting workers to keep detailed tally sheets documenting their sales. R. 275, Trial Tr. at 114, PID 3433; R. 278, Trial Tr. at 10–13, PIDs 3981–84; R. 269, Trial Tr. at 183–85, PIDs 2336–38. And he required prompt payment by customers; otherwise,

workers were required to cover the difference. *See, e.g.,* R. 275, Trial Tr. at 103, PID 3422 (describing Mojo "yell[ing] at Moley and ma[king] him pay" for the drugs he had sold to a buyer who had paid in fraudulent bills). Lastly, workers acted as brokers for Mojo by carrying out the hand-to-hand drug sales that he orchestrated from afar. *See* R. 275, Trial Tr. at 66–67, PIDs 3385–86; R. 273, Trial Tr. at 146, PID 3101. In return for their services, Mojo offered them protection by purchasing guns to station on the block, *id.* at 91–92, PIDs 3410–11, and posting for their bonds if they were arrested. R. 276, Trial Tr. at 138, PID 3684. Based on the foregoing, there were numerous facts to support the jury's conclusion that Mojo was an organizer, supervisor, or manager, and we therefore sustain the jury's verdict convicting him of engaging in a continuing criminal enterprise.

### 2. *Possession of a Firearm in Furtherance of Drug Trafficking*

Mojo also challenges the sufficiency of the prosecution's evidence charging him with possession of a firearm in furtherance of drug trafficking. However, Mojo was not actually convicted of this count, as the jury was unable to reach a verdict. *See* R. 249, Jury Verdict Form at 4, PID 1795. Nonetheless, he seeks an acquittal from this court in order to prevent the possibility of a future retrial. *See* Mojo Br. at 51. However, because there has not been a final judgment below, and a challenge to the sufficiency of the evidence is not collateral to the merits, we lack jurisdiction to entertain his challenge on appeal.

Generally, federal appellate jurisdiction is available to review civil and criminal proceedings only after their termination by final judgment. *DiBella v. United States*, 369 U.S. 121, 124 (1962). This principle has been codified by 28 U.S.C. § 1291, which grants federal appellate courts jurisdiction to review only "final decisions of the district courts," and has been stringently applied to avoid "delays and disruptions attendant upon intermediate appeal." *Abney*

*v. United States*, 431 U.S. 651, 657 (1977) (quoting *DiBella*, 369 U.S. at 126). Here, there has been no final judgment because Mojo was never convicted—or acquitted—of the charge. *See United States v. Canelas-Amador*, 837 F.3d 668, 671 (6th Cir., 2016) ("Final judgment in a criminal case means sentence. The sentence is the judgment." (quoting *Berman v. United States*, 302 U.S. 211, 212 (1937))); *see also Jackson*, 443 U.S. at 318–19 (delineating the standard used to review sufficiency-of-the-evidence claims "to support a criminal *conviction*," and emphasizing the importance of preserving the factfinder's role as weigher of the evidence "[o]nce a defendant *has been found guilty of the crime charged"*) (emphasis added).

In fact, Mojo could be retried on this count tomorrow *even if* we were to reach the merits of his claim and decide that the government presented insufficient evidence. *See Richardson v. United States*, 468 U.S. 317, 325–26 (1984) (holding that "the failure of the jury to reach a verdict is not an event which terminates jeopardy" and that "*[r]egardless of the sufficiency of the evidence at petitioner's first trial*, he has no valid double jeopardy claim to prevent his retrial" (emphasis added)). If we were permitted to entertain Mojo's claim, our decision would amount to little more than an advisory opinion in contravention of Article III.

A challenge to the sufficiency of the evidence also does not come within the exception to the final judgment rule—the collateral order doctrine—as such challenges do not fall within that small class of cases of "claims of right separable from, and collateral to, rights asserted in the action." *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). To the contrary, sufficiency-of-the-evidence claims go to the heart of a petitioner's case and thus are not "completely separate from the merits of the action." *Id.*; *see also Lemoine v. New Horizons Ranch & Ctr., Inc.*, 174 F.3d 629, 634 (5th Cir. 1999) (finding no jurisdiction over a claim that was "nothing more than a determination of the sufficiency of the evidence—a finding which, in

turn, is not truly separable from the underlying claim and is thus not a final order under the collateral order doctrine"). Because the jury's failure to reach a verdict on Mojo's firearm charge was not a final judgment, nor an appealable collateral order, we decline to entertain his sufficiency-of-the-evidence challenge on appeal.

### C. Fouad Faraj

#### 1. *Conspiring to Distribute Marijuana*

Fouad challenges the sufficiency of the evidence to sustain his conspiracy conviction under 21 U.S.C. § 846. Pursuant to this statute, the government was required to prove at trial: (1) that there was an agreement to violate federal narcotics laws; (2) that Fouad knew of and intended to join the conspiracy; and (3) that Fouad participated in the conspiracy. *United States v. Soto*, 794 F.3d 635, 657 (6th Cir. 2015). Fouad acknowledges the "extensive evidence" of a marijuana drug conspiracy operating out of his neighborhood, as well as the fact that his backyard was used as a "safe zone" for workers to escape police detection. Fouad Br. at 13–14. He nevertheless believes that the government failed to present sufficient evidence on the latter two elements. *Id.* at 13. Because the evidence offered by the government demonstrates otherwise, we conclude that a rational jury could have found that Fouad was indeed guilty of conspiring to distribute marijuana.

Once evidence of a conspiracy has been established, a defendant's connection to that conspiracy need only be slight. *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009). The government can demonstrate a defendant's knowledge and intent to join by showing willful membership, but need not prove that he committed an overt act in furtherance of the conspiracy. *United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007). Membership and participation can be inferred through a defendant's actions and reactions to circumstances, *id.*, as well as through

circumstantial evidence, like possessing a large quantity of drugs or cash. *United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015); *United States v. Warman*, 578 F.3d 320, 334 (6th Cir. 2009). Evidence connecting a defendant to the location where drugs are sold is also probative of his involvement, *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008), as is associating with drug dealers, accepting drug proceeds, and using those proceeds to fund home and car renovations. *See United States v. Logan*, 542 F. App'x 484, 496–97 (6th Cir. 2013). Moreover, drug distribution conspiracies are often "chain" conspiracies such that agreement can be inferred based on the interdependence of the enterprise, with participants understanding that their success is dependent on the success of others. *Deitz*, 577 F.3d at 678.

The government easily demonstrated that Fouad had knowledge of the conspiracy, as both his homes on Rutherford were used extensively to carry out its daily operations, with one serving as a "safe house" and the other as a site for marijuana packaging. R. 269, Trial Tr. at 83–84, 95, 128–29, PIDs 2236–37, 2248, 2281–82. This "link" Fouad provided was an important one in the conspiracy's "chain" because the safe house was essential to its success. *Id.* at 90–91, PIDs 2243–44 (Hammoud testifying that having access to Fouad's house was key because it was more difficult for police to secure a search warrant for an occupied, rather than abandoned, dwelling).

Fouad argues that he did not acquiesce to this use of his properties and that he would "shoot at" drug dealers if he caught them there. Fouad Br. at 14. But a closer look at the record reveals that it wasn't the use of his home as a safe house that Fouad objected to; rather, he was concerned that people selling drugs outside of it would attract unwanted police attention. *See* R. 269, Trial Tr. at 137, PID 2503 ("He told me not to serve up the customers in front of his house, to take them down the street to the abandoned house . . . [because] [h]e didn't want any heat on

his home."). Instead of showing Fouad's lack of involvement in the conspiracy, this evidence does the opposite: It shows Fouad had knowledge of the conspiracy and participated in furtherance of it by sanctioning the use of his abandoned home for its use.

Conspirators also did more than simply hideout at Fouad's—it was the epicenter of the conspiracy's entire operation at any given time. For example, it was used to hold meetings, manufacture and store marijuana, count drug proceeds, and as a place where customers picked up their drugs. *See* R. 269 at 66, 69, 86, PIDs 2219, 2222, 2239; R. 272, Trial Tr. at 190, PID 2934; R. 275, Trial Tr. at 72, 103, PIDs 3391, 3422. Additionally, marijuana vials were consistently found scattered throughout Fouad's yard. R. 272, Trial Tr. at 106–07, 170, 191, PIDs 2850–51, 2914, 2935. Given the extensive drug activity taking place at Fouad's, a jury could easily conclude that he had knowledge and intent to join the enterprise.

Fouad was also much more than a passive participant. He accepted drug proceeds in exchange for the use of his homes and used this as a bargaining chip to receive a larger payout. *Id.* at 87, 160, PIDs 2240, 2313 ("Fouad didn't want his house to be used as a safe house no more, and [if] it was to be used as a safe house, he wanted a bigger cut"). Mojo also ordered that the drug proceeds be given to Fouad if anything went awry, and when it did, Fouad gladly accepted the money. *See Logan*, 542 F. App'x at 487 (mere acceptance of drug proceeds is evidence of participation); *Gardner*, 488 F.3d at 711. Additionally, Fouad actively participated in the marijuana trafficking itself. He was described as being in the "upper echelon" of the crew and "in charge of the operation" when Mojo was not around. R. 269, Trial Tr. at 159–60, PID 2312–13. Fouad "supervised" drug dealings, which meant he would "make sure that all the workers were working, [and] he would control the money." R. 275, Trial Tr. at 121, PID 3440; R. 277, Trial Tr. at 185, PID 3962.

Given this overwhelming evidence implicating Fouad, it is plain that his willful connection to the conspiracy was much more than "slight." *Deitz*, 577 F.3d at 677. The success of the enterprise depended on the use of his home, a fact Fouad both knew and used to his advantage. Further, Fouad actively participated by supervising workers and collecting drug money. Thus, the facts indicate that Fouad had sufficient knowledge of, and participation in, the conspiracy such that a rational jury could have found him guilty of conspiring to distribute marijuana.

## IV.  SENTENCING ISSUES

Fouad and Ayoub both raise challenges to their sentences on appeal. Specifically, Fouad argues that the trial judge erred (1) in applying a two-point enhancement to his sentence for involving minors in the conspiracy and (2) in failing to individualize the amount of marijuana attributable to him in calculating his base offense level. Because Fouad's first argument has merit, we vacate Fouad's sentence and remand to the district court for resentencing. Ayoub argues that the trial judge improperly applied a two-point enhancement for possession of a firearm in connection with a drug offense. We conclude that this decision was not clearly erroneous and affirm Ayoub's sentence.

### A.  Standard of Review

We review a district court's findings of fact at sentencing for clear error and its legal conclusions regarding the Sentencing Guidelines de novo. *United States v. Hodge*, 805 F.3d 675, 678 (6th Cir. 2015). A finding of fact is clearly erroneous when "although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Wheaton*, 517 F.3d at 367 (quoting *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003)). This only occurs if the

district court interprets the evidence in a manner inconsistent with the record. *Darwich*, 337 F.3d at 664 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)).

### B. Fouad Faraj

#### 1. *Enhancement for Involvement of a Minor*

First, Fouad argues—and the government concedes—that the sentencing judge erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(15)(B) for involving a minor in the distribution of controlled substances. Fouad Br. at 9–11. The applicability of U.S.S.G. § 2D1.1(b)(15) is a legal question we review de novo. *Hodge*, 805 F.3d at 678. This section states that a two-level enhancement is warranted "[i]f the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors . . . ." It then enumerates many conditions that warrant the enhancement, including when "the defendant, knowing that an individual was (i) less than 18 years of age . . . distributed a controlled substance to that individual or involved that individual in the offense." U.S.S.G. § 2D1.1(b)(15)(B) (2014).

Here, the government presented evidence that Fouad, along with others, hired underage "drug runners," which would trigger this enhancement. Fouad PSR ¶ 18. However, the sentencing judge eliminated the aggravating role enhancement under § 3B1.1 at sentencing, which, as per the Guidelines, is a prerequisite to any enhancement under U.S.S.G. § 2D1.1(b)(15)(B). *See* R. 377, Sentencing Tr. at 24, PID 5815 (discussing Fouad's objection to § 3B1.1 and stating "I think three points in this particular case is too much, and inappropriate, and I'll sustain the objection. So we will eliminate the three-point enhancement for being a supervisor or managerial or coordinated co-conspirator in criminal activity that involved five or more."). Despite this elimination, the trial judge went on to apply the enhancement for involving

minor participants under § 2D1.1(b)(15)(B). R. 377, Sentencing Tr. at 15–20, PIDs 5806–11 (discussing the enhancement and determining that, given "the relationship between these kids who were involved in this behavior I think the enhancement is properly applied").

Because Fouad was charged with a two-level enhancement to his base offense level under § 2D1.1(b)(15)(B) without receiving the predicate enhancement for an aggravated role under § 3B1.1, the district court committed legal error that resulted in a miscalculation of the Guidelines range. This error resulted in a base offense level of 26, which, together with a criminal history category of I, produced a Guidelines range of 63-78 months. However, if the minor participant enhancement had not been incorrectly applied, Fouad's base offense level would have been 24, lowering the Guidelines range to 51-63 months. Because Fouad was sentenced to 70 months imprisonment, Fouad was prejudiced by the incorrect application of § 2D1.1(b)(15)(B) and thus we must vacate Fouad's sentence and remand for resentencing. *See United States v. Kamper*, 748 F.3d 728, 749 (6th Cir. 2014) (finding that an incorrect calculation of defendant's Guidelines range is reversible procedural error).

2. *Failure to Individualize Amount of Marijuana Attributable to Fouad*

Next, Fouad argues that the sentencing judge erred in holding him accountable for the total amount of marijuana attributed to the conspiracy when establishing his base offense level. *See* Fouad Br. at 17. The jury determined that the conspiracy involved more than 50 kilograms of marijuana, but less than 100 kilograms. R. 249, Jury Verdict Form at 4, PID 1795. Fouad's Pre-Sentence Report classifies his base offense at 22, a level that corresponds with a quantity of between 80 and 100 kilograms. *See* Fouad's PSR ¶ 23; U.S.S.G. § 2D1.1(c)(9).

For drug crimes, the base offense level depends on the amount of drugs involved in the offense, which "in the case of a jointly undertaken criminal activity," is to be analyzed in light of

"all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See* U.S.S.G. §§ 1B1.3(a)(1)(B) (2014); 2D1.1(c); *see also* U.S.S.G. § 1B1.3, cmt. 2 (stating that in order to determine an individual's accountability under (a)(1)(B), "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake"). Fouad argues that he should not be responsible for 80-100 kilograms of marijuana because he played a limited role in the conspiracy and because the sentencing judge failed to make particularized findings on his involvement as required by *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002). In addressing Fouad's objection to his base offense level, the sentencing judge overruled it because, although "Mr. Faraj was a minimal participant, . . . the base offense level deals with the amount of marijuana found. And I think that clearly I can determine as a matter of law that the amount involved was over 80 kilograms." R. 377, Fouad Sentencing Tr. at 24–25, PIDs 5815–16.

In light of the fact that Fouad is being resentenced based on a misapplication of the U.S.S.G. § 2D1.1(b)(15)(B) enhancement, it is not necessary for us to resolve Fouad's argument now. However, on remand the district court should determine whether Fouad's involvement in the conspiracy renders it appropriate to attribute the entire amount of marijuana to him for sentencing purposes and delineate the reasons for this conclusion in line with *Campbell*. 279 F.3d at 400.

### C. Mohamed Ayoub

#### 1. *Enhancement for Possession of a Firearm in Connection with Drug Trafficking*

Ayoub argues that the sentencing judge erred in applying a two-level enhancement to his sentence under U.S.S.G. § 2D1.1(b)(1) for possessing a firearm in connection with a drug offense. We review a district court's factual findings regarding the application of the firearms

enhancement for clear error. *United States v. Ward*, 506 F.3d 468, 474 (6th Cir. 2007). Section 2D1.1(b)(1) states that "[i]f a dangerous weapon (including a firearm) was possessed, increase [the base offense level] by 2 levels." The Commentary then explains that the "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n. 11(A). Based on this guidance, we have adopted a two-step framework to determine the applicability of this enhancement. Step one, the government must show by a preponderance of the evidence that the defendant either actually or constructively possessed the weapon. *United States v. Rios,* 830 F.3d 403, 437 (6th Cir. 2016). If it does so, then "a presumption arises that the weapon was connected to the offense," and under step two, the burden shifts to the defendant to rebut this presumption by showing that it was "clearly improbable that the weapon was connected with the crime." *Id.* (quoting *Darwich*, 337 F.3d at 665). Evidence, and not mere argument, is required for the defendant to overcome this burden. *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012).

Under step one, a defendant is in constructive possession of a weapon if he has "ownership, or dominion or control over the item itself, or dominion over the premises where the item is located." *Wheaton*, 517 F.3d at 367 (emphasis omitted) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). Here, Ayoub had both. He concedes that he owned a 9mm semiautomatic pistol and carried it pursuant to his Concealed Pistol License (CPL). Ayoub Br. at 34. Many conspirators testified that Ayoub "always" had his weapon with him throughout the conspiracy. *See* R. 269, Trial Tr. at 172, PID 2325; R. 275, Trial Tr. at 149, PID 3468; R. 278, Trial Tr. at 34, PID 4005. Ayoub also had "dominion over the premises" where the firearm was located, as police recovered it from his home, along with several other drug-related items, while executing a search warrant. R. 277, Trial Tr. at 26, PID 3803. Thus, the burden shifts to Ayoub

under step two to demonstrate that it was "clearly improbable that the weapon was connected with the offense."

He has not met this burden. Ayoub makes numerous arguments, essentially boiling down to the following: (1) There was no evidence that he actually used the weapon while selling drugs; and (2) There was no incriminating evidence found in his home alongside the weapon that would implicate him in the enterprise. *See* Ayoub Reply Br. at 7–10, 15–19.

First, it was not clearly erroneous for the trial judge to conclude that Ayoub utilized his weapon in furtherance of the conspiracy. Ayoub played an integral role in trafficking marijuana on behalf of the enterprise, serving as "street captain" and someone who "t[ook] over the organization" during its late stages. *See* R. 269, Trial Tr. at 172, PID 2325; R. 277, Trial Tr. at 185, PID 3962; R. 270, Trial Tr. at 159, PID 2525. The extent of his involvement included "control[ing] the money and the workers," making drug sales and deliveries, and bagging marijuana. *See* R. 277, Trial Tr. at 70, PID 3847; R. 275, Trial Tr. at149, PID 3468, R. 269, Trial Tr. at 172, PID 2325; R. 270, Trial Tr. 158–59, PIDs 2524–25. Because Ayoub was "always" seen with his weapon, it is reasonable to conclude that he carried it with him while fulfilling these duties, and the record reinforces this conclusion.

For example, one co-conspirator testified that when Ayoub delivered drugs to him he would "flash" his gun by intentionally having it visible on his waist,"[p]robably trying to intimidate me" because "I just wasn't trusted enough by [the rest of the conspiracy]." R. 276, Trial Tr. at 114–15, PIDs 3660–62. This evidence, standing alone, is enough to warrant the sentencing enhancement. *See United States v. McCurry*, 220 F. App'x 411, 413 (6th Cir. 2007) (noting that "defendant's mere possession of a weapon during narcotics commerce . . . trigger[s] the section 2D1.1(b)(1) enhancement because the possibility existed that the defendant would

have used the gun during the drug transaction had he thought it necessary") (alteration and omission in original) (quoting *United States v. Dunlap*, 209 F.3d 472, 479 (6th Cir. 2000)).

Second, the marijuana, scale, tally sheets, large sum of cash, and extra ammunition found in Ayoub's home along with his loaded weapon make it likely, rather than "clearly improbable," that the weapon was connected to the conspiracy. *See, e.g.,* R. 277, Trial Tr. at 26, PID 3803; R. 277, Trial Tr. at 24–61, PIDs 3801–38; R. 278, Trial Tr. at 21, 25–26, PID 3992, 3996–97. The fact that Ayoub's weapon was loaded is itself a factor to consider in applying the sentencing enhancement under § 2D1.1. *See United States v. Moses*, 289 F. 3d 847, 850 (6th Cir. 2002). In addition, many of the tally sheets were either written by Ayoub, or referred to him by his nickname, "Ping." The police also found a green cylinder containing marijuana cigarette butts. Ayoub dismisses this finding as being consistent with mere "personal use" and argues that police otherwise found no evidence of narcotics trafficking. Ayoub Reply Br. at 7–8. Yet, while this may not provide evidence of dealing, it does show that Ayoub's weapon was in close proximity to illicit drugs, which is a relevant factor. *See Greeno*, 679 F.3d at 515.

The record also refutes Ayoub's argument that there was no evidence of narcotics packaging. Police recovered a digital scale, which was used by the conspiracy to measure larger quantities of marijuana, "eighths," that the enterprise sold in baggies. R. 269, Trial Tr. at 189, PID 2342. And, while no plastic baggies were discovered at the time of the search, several conspirators testified that bagging did take place at Ayoub's home and marijuana was sometimes stored there. *See* R. 270, Trial Tr. at 159, PID 2525; R. 273, Trial Tr. at 158–60, PIDs 3113–15. Finally, police found $7,000 cash hidden in a basement ceiling tile. *See* R. 277, Trial Tr. at 24–61, PIDs 3801–38. While Ayoub claims this money was from a recently cashed settlement check —also found in his home—for $7,639.33, rather than drug proceeds, his rationale is

uncorroborated. Ayoub Reply Br. at 10. When questioned about it, the agent who searched Ayoub's home was unable to confirm the name on the check, its amount, or that it was even a check in the first place. R. 277, Trial Tr. at 58–59, PIDs 3835–36. And, evidence of large sums of cash can be "strong evidence" of illegal drug activity. *See United v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 285 (6th Cir. 1992); *see also United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014). At best, Ayoub has presented an alternative view of the evidence, in which case the "factfinder's choice between them cannot be clearly erroneous." *Wheaton*, 517 F.3d at 367 (quoting *Anderson*, 470 U.S. at 574).

Lastly, neither Ayoub's concealed carry permit, nor the fact that he was acquitted of the firearm charge at trial, help his case. The fact that Ayoub was legally permitted to carry his weapon perhaps even made it even easier for him to utilize it in furtherance of the conspiracy because he could carry unrestricted. *See McCurry*, 220 F. App'x at 413 (6th Cir. 2007) (citing *United States v. McGhee*, 882 F.2d 1095, 1100 (6th Cir. 1989)) ("[O]ne can come into possession of a gun for a perfectly legitimate reason and still use it or have it available for use during a drug trafficking crime."). So too, the fact that Ayoub was acquitted under 18 U.S.C. § 924(c) at trial does not preclude the government from demonstrating at sentencing that an enhancement is warranted under U.S.S.G. § 2D1.1(b) due to the lighter burden of proof at sentencing (preponderance of the evidence) than at trial (beyond a reasonable doubt). *See United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc). Given all of this evidence tying Ayoub's firearm to the conspiracy, we are not left with the "definite and firm conviction" that the sentencing judge clearly erred in applying a two-level enhancement to his sentence under §2D1.1. *See Wheaton*, 517 F.3d at 367.

## V.    CONCUSION

For the reasons stated above, we **AFFIRM** the district court judgment on all counts as to Mohamed Faraj and Mohamed Ayoub.  We **AFFIRM** Fouad Faraj's conviction, but **VACATE** his sentence and **REMAND** his case for resentencing.